UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

RECEIVED CLERKS OFFICE

2005 APR 13 A 9: 28

DISTRICT COURT
STRICT SOUTH CAROLINA
COLUMBIA SC

| | |
|---|---|
| CAPITAL GUARDIAN U.S.<br>FIXED-INCOME MASTER FUND,<br>CAPITAL GUARDIAN GLOBAL FIXED-<br>INCOME FUND, and CHILDREN'S<br>HOSPITAL OF LOS ANGELES<br>INVESTMENT FUND<br><br>        Plaintiff,<br><br>    v.<br><br>PRICEWATERHOUSECOOPERS LLP,<br>JAMES R. BULLOCK, LESLIE W.<br>HAWORTH, HENRY B. TIPPIE,<br>JAMES L. WAREHAM, PAUL R.<br>HUMPHREYS, KENNETH W. WINGER,<br>MICHAEL J. BRAGAGNOLO,<br>and TD SECURITES (USA) INC.,<br><br>        Defendants. | Case No. _____<br><br>JURY DEMAND<br><br>**3   05   1009  JFA** |

## COMPLAINT

Plaintiffs Capital Guardian U.S.Fixed-Income Master Fund, Capital Guardian Global

Fixed-Income Fund and Children's Hospital Of Los Angeles Investment Fund (collectively,

"Plaintiffs"), by their  undersigned counsel, makes the following allegations against

PricewaterhouseCoopers LLP, James R. Bullock, Leslie W. Haworth, Henry B. Tippie, James L.

Wareham, Paul R. Humphreys, Kenneth W. Winger, Michael J. Bragagnolo, and TD Securities

(USA) Inc. (collectively, "Defendants").

## NATURE OF THE ACTION

1.      In reliance upon the financial statements published by Safety-Kleen Corporation

("Safety-Kleen") and/or its predecessor, Laidlaw Environmental Services, Inc. ("LES") (together,

with their subsidiaries, the "Company"), Plaintiffs purchased 9¼ % senior notes due in 2009 (the

"2009 Bonds" or the "Bonds").  Unbeknownst to Plaintiffs at the time of their purchases, the

Company's financial statements upon which Plaintiffs based their purchase decisions were

materially false and misleading.

2.      On March 6, 2000, the Company announced that it had uncovered material

"accounting irregularities" in its financial reports, leading it to place its three top executives –

Defendants Kenneth W. Winger ("Winger"), Michael Bragagnolo ("Bragagnolo") and Paul R.

Humphreys ("Humphreys") – on leave while a Special Committee appointed by Safety-Kleen's

Board of Directors ("the Board") investigated the extent to which the Company would need to

restate its financial reports for prior periods.  Winger, Bragagnolo and Humphreys all

subsequently resigned as officers and directors of the Company.

3.      On March 9, 2000, the Company informed the investing public that

PricewaterhouseCoopers LLP ("PwC"), the Company's accountant, had withdrawn its previously

issued reports on the Company's financial statements for the fiscal years ended August 31, 1999,

1998 and 1997.  These included the very financial statements upon which Plaintiffs relied in

purchasing Bonds.

4.      In response to the Company's announcements relating to the accounting

irregularities, the value of the Bonds plunged dramatically, losing over 80% of their value by

March 16, 2000.  By June 9, 2000, a mere three months after the disclosure of accounting

-2-

irregularities, the Company had defaulted on the Bonds and filed for Chapter 11 bankruptcy protection.

5.      Following an extensive internal investigation by the Company and a forensic audit of the Company's financial statements by Arthur Anderson LLP ("Arthur Anderson"), the Company issued a Form 10-K/A (the "Restatement") containing restated financial statements for the fiscal years ended August 31, 1997 ("fiscal 1997"), August 31, 1998 ("fiscal 1998"), and August 31, 1999 ("fiscal 1999"). The magnitude of the Restatement was tremendous, decreasing the Company's net income by over half a billion dollars for the three fiscal years. Another $800 million in errors were detected which the Company was unable to tie to a specific year. The Restatement constitutes an admission that the previous financial statements for fiscal 1997, 1998 and 1999 -- the ones upon which Plaintiffs relied in purchasing the Bonds: (a) were materially false and misleading; (b) did not accurately reflect the true picture of the Company's financial condition; and (c) did not comply with GAAP when they were issued. Indeed, GAAP prohibits restatements unless the original statements were materially false at the time they were issued.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1337 and 1367.

7.      The claims herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and common law.

-3-

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa; and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the

preparation and dissemination of false and misleading statements to the investing public, occurred

in substantial part in this District, as the Company's principal place of business was located in this

District during the time period relevant to this action.  In addition, the Judicial Panel on

Multidistrict Litigation has entered an order centralizing all federal securities litigation related to

the issues in this case in this Court.

9.    In connection with the acts, conduct, and course of conduct alleged in this

Complaint, the defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES AND OTHER
## RELEVANT ENTITIES

### Plaintiff

10.    Plaintiff Capital Guardian U.S. Fixed-Income Master Fund (the "Fixed-Income

Fund") is a commingled trust fund established under the Capital Guardian Employee Benefit

Investment Trust ("CGEIT") for which Capital Guardian Trust Company ("CGTC") serves as

trustee and investment adviser.  Pursuant to an agreement between the Fixed-Income Fund and

CGTC, CGTC makes investment decisions on behalf of the Fixed-Income Fund.  Prior to March

6, 2000, CGTC purchased a total par amount of $7,000,000 of 2009 Bonds on behalf of the Fixed-

Income Fund.  When the potential accounting irregularities were disclosed on March 6, 2000,

the Fixed-Income Fund continued to hold $3,525,000 principal amount of 2009 Bonds.

The Fixed-Income Fund's transactions in the Bonds during that period are set forth below:

-4-

| Transaction Date | Bond Series | Purchase/Sale | Principal Amount | Price |
|---|---|---|---|---|
| 5/10/1999 | 2009 | Purchase | 2,650,000 | 100.00 |
| 6/21/1999 | 2009 | Purchase | 2,350,000 | 101.50 |
| 6/23/1999 | 2009 | Purchase | 2,000,000 | 101.50 |
| 2/9/2000 | 2009 | Sale | (3,475,000) | 85.00 |

11.    Plaintiff Capital Guardian Global Fixed-Income Fund - Semi-Monthly Valued (the "Global Fund") is commingled trust fund established under the CGEIT for which CGTC serves as trustee and investment adviser. Pursuant to an agreement between the Global Fund and CGTC, CGTC makes all of the investment decisions on behalf of the Global Fund. On May 10, 1999 CGTC purchased $250,000 principal amount of 2009 Bonds on behalf of the Global Fund in the initial offering of the Bonds, at par value. The Global Fund held the full principal amount of $250,000 through March 6, 2000.

12.    Plaintiff Children's Hospital of Los Angeles Investment Fund (the "Children's Hospital Fund") is a tax-exempt organization that has hired CGTC to manage a portion of its fund assets. Pursuant to an agreement between the Children's Hospital Fund and CGTC, CGTC has sole investment discretion on behalf of the portfolio CGTC manages for Children's Hospital Fund. On May 10, 1999 CGTC purchased $250,000 principal amount of 2009 Bonds on behalf of the Children's Hospital Fund in the initial offering of the Bonds, at par value. The Children's Hospital Fund held the full principal amount of $250,000 through March 6, 2000.

**Safety-Kleen**

13.     Safety-Kleen, a non-defendant in this action, is a Delaware corporation which, at all times relevant to this action, had its principal executive offices at 1301 Gervais Street, Suite 300, Columbia, SC 29201. Through its subsidiaries, Safety-Kleen provided industrial waste services designed to collect, process, recycle and dispose of hazardous and industrial waste streams. The Company provided these services from approximately 280 collection and processing locations in 45 states and seven Canadian provinces.

14.     Safety-Kleen was formed when LES (through its subsidiary, LES, Inc.) acquired all of the outstanding capital stock of the former Safety-Kleen Corporation ("Old Safety-Kleen") in a tender offer and subsequent merger completed in May 1998 (the "Safety-Kleen Acquisition"). As part of the Safety-Kleen Acquisition, the entire Board of Old Safety-Kleen was replaced by directors of LES, including Defendants Bullock, Haworth, Tippie, Wareham, and Winger. LES subsequently announced on June 22, 1998 that, effective July 1, 1998, it would begin doing business as Safety-Kleen under the NYSE ticker symbol "SK." On November 25, 1998, LES officially changed its name to Safety-Kleen Corporation.

15.     Laidlaw, Inc. ("Laidlaw") was the majority stockholder of LES until the Safety-Kleen Acquisition. Following the Safety-Kleen Acquisition, Laidlaw continued to own more than one-third of Safety-Kleen's outstanding common stock, and held a debenture which enabled it to increase that ownership to 48%.

**Defendants**

16.     Defendant PricewaterhouseCoopers LLP ("PwC"), which was formerly known as Coopers & Lybrand LLP ("Coopers"), is an accounting firm that at all relevant times provided

-6-

accounting services to Safety-Kleen and LES. PwC audited the consolidated financial statements

of LES and Safety-Kleen for the fiscal years ended August 31, 1997, 1998 and 1999; issued

unqualified opinions that those financial statements fairly presented the Company's financial

condition in accordance with generally accepted accounting principles ("GAAP"); and represented

that its audits had been conducted in accordance with generally accepted auditing standards

("GAAS"). PwC also reviewed the Company's draft quarterly financial statements before their

issuance, to ensure their compliance with GAAP and with SEC rules and regulations. These

financial statements were incorporated into and made a part of the Company's public filings,

offering memoranda and registration statements with the knowledge and express consent of PwC.

PwC was specifically engaged to perform accounting services in connection with the Company's

Bond offerings, including review of the Company's registration statements and offering

memoranda and the provision of comfort letters to the underwriters. PwC was also, at relevant

times, the "independent" auditor for Laidlaw and TD Securities (USA) Inc.

17.     Defendant James R. Bullock ("Bullock") was the Chairman of the Board and a

Director of LES from May 1997 through the date of the Safety-Kleen Acquisition, and held those

same positions with Safety-Kleen from the time of the Safety-Kleen Acquisition until he resigned

from those positions on or about January 25, 2000. Bullock was also a Director and Chief

Executive Officer of Laidlaw through December 1999, and during that time he was in frequent

and close communication with Safety-Kleen's Chief Executive Officer, Kenneth Winger. Bullock

signed the Company's Registration Statements and SEC filings which contained materially false

and misleading information.

18.     Defendant Leslie W. Haworth ("Haworth") served as a Director of LES from May 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition. Haworth was also the Chief Financial Officer of Laidlaw for over 25 years (including during the time period relevant to this cas), and he kept in close contact with the Chief Financial Officer of Safety-Kleen, Paul Humphreys. Haworth served as the Chairman of the Audit Committee of the Board of Safety-Kleen until March 23, 1999, when he stepped down because he did not satisfy the New York Stock Exchange's criteria for independence. However, he continued to attend and actively participate in Audit Committee meetings through the end of 1999, essentially playing the same role as before but without the ability to vote. Haworth signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

19.     Defendant Henry B. Tippie ("Tippie") served as a Director of LES from May 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition. In March 1999, Tippie became the Chairman of the Audit Committee of the Board of Safety-Kleen. Tippie signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

20.     Defendant James L. Wareham ("Wareham") served as a Director of LES from June 1997 until the Safety-Kleen Acquisition, and as a Director of Safety-Kleen at all relevant times after the Safety-Kleen Acquisition. Wareham was a member of the Audit Committee of the Board of Safety-Kleen at all relevant times. Wareham signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

21.    Defendant Kenneth W. Winger ("Winger") was President, Chief Executive Officer and a Director of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. Prior to his resignation, Winger had been placed on administrative leave by the Board on March 6, 2000. Winger made many of the false and misleading statements alleged herein, and signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

22.    Defendant Paul R. Humphreys ("Humphreys") was Senior Vice President of Finance and Chief Financial Officer of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. He had previously served as Manager of Finance for Laidlaw for more than five years. Though not a director of the Company, Humphreys attended and played a prominent role in virtually all Board meetings. Prior to his resignation, Humphreys had been placed on administrative leave by the Board on March 6, 2000. Humphreys made many of the false and misleading statements alleged herein, and signed the Company's Registration Statements and SEC filings which contained materially false and misleading information.

23.    Defendant Michael J. Bragagnolo ("Bragagnolo") was Executive Vice President and Chief Operating Officer of LES from May 1997 until the Safety-Kleen Acquisition, and held those same positions at Safety-Kleen from the time of the Safety-Kleen Acquisition until his resignation on or about May 12, 2000. As Chief Operating Officer, Bragagnolo was responsible for all of the revenue-generating field operations of the Company, and was fully familiar with the

-9-

financial results of those operations. Prior to his resignation, Bragagnolo had been placed on administrative leave by the Board on March 6, 2000.

24.     The Defendants listed in paragraphs 17 through 23 are referred to collectively herein as the "Individual Defendants." By virtue of their positions as senior executive officers of the Company and/or as members of the Company's Board of Directors, the Individual Defendants had access to non-public information about the Company's operations, markets, finances, financial condition, and present and future business prospects. The Individual Defendants had access to such information via: access to internal corporate documents; conversations and connections with other corporate officers and employees; attendance at meetings of management, the Board of Directors, and committees thereof; and reports presented to management and/or the Board of Directors or Board committees.

25.     Defendant TD Securities (USA) Inc. ("TD Securities") is an investment bank, incorporated under the laws of the State of Delaware, that at all relevant times provided financial advisory and underwriting services to Safety-Kleen and LES. TD Securities was a lead underwriter for the Bonds, and a lead arranger and syndication agent on the Company's credit facilities. An affiliate of TD Securities was also a lender under those credit facilities. TD Securities was heavily involved in marketing derivative transaction to the Company from 1998 through early 2000, and one of its affiliates was a counterparty to the Company on numerous derivative transactions. In addition, TD Securities' securities analysts published research reports regarding the Company and the Bonds.

## THE ACQUISITIONS FORMING SAFETY-KLEEN

26.      Prior to May 1997, Laidlaw Environmental Services ("Old LES") was a wholly owned subsidiary of Laidlaw which was engaged in the hazardous and industrial waste business. Defendants Bullock and Haworth, as the Chief Executive Officer and Chief Financial Officer of Laidlaw, were responsible for the operations and financial reporting of Old LES, which constituted one of Laidlaw's three core businesses. PwC's predecessor, Coopers, served as the outside auditor for Laidlaw and Old LES, and Bullock and Haworth were two of the primary contacts between Coopers and Laidlaw/Old LES. Coopers found the accounting practices of Old LES, which were approved by Laidlaw, to be aggressive during this time period.

27.      In May 1997, Old LES was acquired by Rollins Environmental Services, Inc. ("Rollins"), the largest commercial hazardous waste incineration company in North America. Upon consummation of the Rollins Acquisition, which was accounted for as a reverse acquisition, Rollins changed its name to Laidlaw Environmental Services, Inc. To finance the Rollins Acquisition, LES: (i) issued 120 million shares of LES Common Stock, (ii) issued a $350.0 million 5% subordinated convertible pay-in-kind debenture (the "PIK Debenture") and (iii) paid $349.1 million in cash to Laidlaw. LES issued a $60 million promissory note (the "Promissory Note") to an affiliate of TD Securities in order to raise the cash necessary to complete the transaction. The Promissory Note was guaranteed by Laidlaw.

28.      Following the Rollins Acquisition, Laidlaw owned 67% of LES, and LES revenue represented 20% of Laidlaw's revenues. By virtue of its 67% ownership, Laidlaw continued to control LES.

-11-

29.    Pursuant to the merger agreement with Rollins, Laidlaw was entitled to designate three members of the LES Board. As Chief Executive Officer of Laidlaw, Bullock exercised that power and selected himself, Haworth, and John Grainger (another senior Laidlaw executive). Defendant Winger, whom Bullock had appointed President of Old LES and who continued as President of LES following the Rollins Acquisition, also sat on the LES Board. The other six members of the LES Board included Tippie and two others appointed by Rollins, and Wareham and two others whom Bullock selected and Rollins approved.

30.    In April 1998, LES acquired by means of a tender offer approximately 94% of the common stock of Old Safety-Kleen, followed by a short-form merger in May 1998, in which the remaining outstanding shares of Old Safety-Kleen were acquired by LES (together, the "Safety-Kleen Acquisition").

31.    The aggregate consideration paid by LES in the Safety-Kleen Acquisition was approximately $1.1 billion in cash and the issuance of approximately 168 million shares of common stock of LES. At approximately the same time, LES also repurchased substantially all of Old Safety-Kleen's outstanding $100.0 million 9-1/4% notes due September 15, 1999 (the "Debt Repurchase").

32.    LES financed the cash portion of the Safety-Kleen Acquisition and the Debt Repurchase and refinanced certain indebtedness with total borrowings of approximately $1.8 billion under a senior secured bank facility (the "Senior Credit Facility") with Toronto Dominion Bank (an affiliate of TD Securities) and a syndicate of banks, which was consummated pursuant to a credit agreement dated April 3, 1998.

-12-

33.    Following the Old Safety-Kleen Acquisition, Laidlaw owned 35% of the Company's outstanding stock, as well as the PIK debenture which Laidlaw could redeem and increase its ownership to approximately 48%. Although less than a majority, Laidlaw's block of stock following the Old Safety-Kleen Acquisition gave it effective control over the election of directors to the Company's Board. Bullock decided how Laidlaw would vote its stock. Following the Old Safety-Kleen Acquisition, the composition of the Board did not change, except for the March 1999 replacement of Mr. Grainger with another individual selected by Bullock, Robert Luba. Defendants Bullock, Haworth, Tippie, Wareham, and Winger continued to serve as directors of the Company at all relevant times.

34.    The members of the Company's senior management team were former Laidlaw employees who had been selected when the Company was a wholly-owned subsidiary of Laidlaw, managed by Bullock and Haworth. Bullock appointed Winger as president of Old LES in 1995, and until the Rollins Acquisition, Winger reported directly to Bullock. With input from Haworth, Bullock recommended that the Company's Board hire Humphreys, who was Haworth's protege from Laidlaw, as the Chief Financial Officer. Bullock also recommended Bragagnolo, another former Laidlaw employee, for the position of Chief Operating Officer.

## THE COMPANY'S IMPROPER ACCOUNTING PRACTICES

35.    Beginning in at least 1997, the defendants caused LES to artificially inflate its reported revenue and income by a wide variety of improper practices. As a result, LES and later Safety-Kleen reported their financial results in a manner not in conformity with GAAP.

36.    The following are some of the improper practices that defendants employed:

-13-

## Accounting for Derivatives

37.     The Company's financial statements contained improper accounting for interest

rate derivative contracts, and failed to disclose the true nature of those contracts. Its financial

statements for fiscal 1998 and fiscal 1999 stated that Safety-Kleen "uses interest rate swap

agreements to minimize the impact of interest rate fluctuations on floating interest rate long-term

borrowings" and further stated that "[t]he differential paid or received on interest rate swap

agreements is recognized as an adjustment to interest expense." These statements are consistent

with the terms of the Senior Credit Facility, which required "interest rate protection" satisfactory

to Toronto Dominion Bank (an affiliate of TD Securities) in respect to at least 40% of the

Company's floating rate debt until at least March 31, 2000, but are not reflective of what was

actually being done.

38.     Typically, a borrower obtains interest rate protection by entering into derivative

contracts such as interest rate caps, collars, or swaps. In an interest rate cap, the borrower pays a

premium to a counterparty in exchange for the counterparty's agreement to make payments to the

borrower in the event interest rates rise above a specified level, with the effect of limiting the

borrower's floating interest rate to the specified level. An interest rate collar consists of a cap and

a corresponding floor (a rate below which the borrower's payments will not go); because the

borrower pays a premium for the cap and receives a premium for the floor, these contracts can be

structured so that the premiums cancel out, and the borrower's interest rate is limited to the range

between the cap and the floor at no up front cost. An interest rate swap is a contract in which the

party seeking interest rate protection agrees to pay fixed rate payments on a hypothetical "notional

amount" in exchange for floating rate payments on the same notional amount; if the swap is

-14-

priced at the market rate, then the fixed payment will be higher than the floating payment at the

contract's inception, and no up front payment or premium is involved.

39.    During the relevant time period, GAAP for interest rate derivative contracts that

were used as "interest rate protection" – i.e., used to hedge identified interest rate risk to which the

company was subject due to floating rate debt – permitted the derivative contracts to be omitted

from the balance sheet, with the premiums paid (for a cap) or cash flow differentials paid or

received (with respect to a swap) being treated as adjustments to interest expense.

40.    In its audited financial statements for the fiscal year ending August 31, 1998,

Safety-Kleen stated that:

> The Company has entered into interest rate swap agreements to alter
> interest rate exposures. These agreements, with a principal notional
> amount of $710 million, expire in periods ranging from 0.5 to 30
> years, with a weighted average of approximately 7 years. The
> Company pays fixed rates ranging from 5.16% to 6.17%, and
> receives floating rates based on U.S. Dollar LIBOR, determined on
> a quarterly basis of 5.6875% as of August 31, 1998.

* * * *

> The Company's fair value cost for all interest rate derivative
> contracts as of August 31, 1998 was approximately $11.1 million.
> At August 31, 1998, the Company had no plans to terminate these
> positions prior to maturity.

41.    In its audited financial statements for the fiscal year ended August 31, 1999,

Safety-Kleen stated that:

> The Company has entered into interest rate swap agreements to alter
> interest rate exposures. These agreements, with a principal notional
> amount of $1,095 million, expire in periods ranging from 2 to 30
> years, with a weighted average of approximately 10.2 years. The
> Company pays fixed rates ranging from 5.31% to 6.71%, and
> receives floating rates based on U.S. Dollar LIBOR, determined on
> a quarterly basis of 5.52% as of August 31, 1999.

-15-

* * * *

> The Company's fair value cost for all interest rate derivatives
> contracts as of August 31, 1999, was approximately $30.6 million.
> At August 31, 1999, the Company had no plans to terminate these
> positions prior to maturity.

42.    With one notable exception, these disclosures appear to be generally consistent

with a strategy of maintaining interest rate protection on floating rate long-term debt. The

exception is that it is unusual to have one or more derivative contracts with a 30-year expiration,

where the company is purportedly hedging floating rate debt instruments with a maximum

maturity of eight years, such as the Senior Credit Facility. The presence of one or more derivative

contracts with such long maturities was a red flag that should have prompted careful scrutiny of

interest rate derivative contracts during the Company's audits for 1998 and 1999. Such scrutiny

would have revealed that the 30-year swap was speculative and not a legitimate hedge, and that it

had been improperly accounted for.

43.    In fact, in addition to using "plain vanilla" interest rate swap contracts to create the

appearance of "interest rate protection," during fiscal 1998 and fiscal 1999 the Company was

engaged in an extensive program of taking speculative risks on market changes in interest rates in

order to generate cash payments. The Senior Credit Facility expressly prohibited the Company

from engaging in speculative derivative transactions, and this program was not disclosed in the

Company's periodic financial reports. Moreover, this speculative, cash-generating program was

completely inconsistent with Safety-Kleen's disclosures concerning the nature of its use of

derivatives (to minimize interest rate risk), its accounting treatment of such swaps, and its

compliance with the covenants in the Senior Credit Facility. By the end of fiscal 1999, Safety-

Kleen had generated approximately $38 million in cash through its derivatives program.

-16-

44.    The Company used numerous methods to generate cash in its interest rate

derivative program.  These methods included:

(a)    **Selling "Swaptions**."  A "swaption" is an option that is settled by entering into a

pre-specified interest rate swap transaction.  The party which sells the swaption receives a

premium, and the buyer receives the option, exercisable by or on a specified date, to enter into the

specified swap with the seller.  Examples of swaptions written by Safety-Kleen included:

> **Toronto Dominion Bank ("TD Bank") February 1999**
> **Swaptions**.  On February 26, 1999, the Company received
> $20,210,000 in premiums from TD Bank (an affiliate of TD
> Securities) in exchange for four identical swaptions.  These
> swaptions gave TD Bank the option, exercisable on May 30, 2003,
> to enter into swaps covering a total notional amount of $325 million
> in which the Company would pay a fixed rate of 9.25% and receive
> floating rate payments of 3-month LIBOR plus 125 basis points
> from June, 2003 to June, 2008.  This transaction was, in essence, a
> highly speculative bet by the Company that 3-month LIBOR would
> rise to 8% by June, 2003 and remain at or above that level for five
> years; TD Bank paid over $20 million to take the other side of that
> bet.
>
> **Citibank November 1998 Swaptions**.  In November, 1998, the
> Company sold three swaptions to Citibank.  In the first swaption,
> the Company received a premium of $1,033,160, and Citibank
> received an option, exercisable by August 31, 1999, to enter into a
> swap covering a notional amount of $50,000,000 in which the
> Company would pay a floating rate of 3-month LIBOR and Citibank
> would pay a fixed rate of 5.725% from January, 2002 until October,
> 2028.  This swaption had the effect of potentially exposing the
> Company to floating rate risk for a period of twenty-six years.  In
> the second swaption, the Company received a premium of
> $1,115,910 and Citibank received an option, exercisable by August
> 31, 1999, to enter into a swap covering a notional amount of $35
> million in which the Company would pay a floating rate of 3-month
> LIBOR and Citibank would pay a fixed rate of 5.57% from January,
> 2002 until October, 2018.  This swaption had the effect of
> potentially exposing the Company to floating rate risk for sixteen
> years.  In the third swaption, the Company received a premium of
> $2,209,700 and Citibank received an option, exercisable by June 1,

-17-

2002, to enter into a swap covering a notional amount of $100 million, in which the Company would pay a fixed rate of 6.0475% and Citibank would pay 3-month LIBOR from June, 2005 to June, 2012.

**Citibank May, 1999 Swaption**. On May 28, 1999, the Company received a premium of $1,060,000 for selling Citibank an option, exercisable by June 1, 2000, to enter into a swap covering a notional amount of $100 million in which the Company would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 7% from June, 2000 to June, 2030. The effect of the transaction was to potentially expose the Company to floating rate risk for a period of thirty years.

(b)    **Entering into swaps with embedded written options**. Interest rate swap

contracts can take many forms, ranging from the "plain vanilla" swaps actually disclosed in the

Company's statements to highly leveraged swaps or swaps containing embedded options. The

Company entered into numerous swap contracts containing embedded "written" (meaning the

Company was the seller and received a premium) options. Some examples include:

**May, 1999 Citibank Embedded Option Swap.** On May 28, 1999, the Company received a premium of $1,220,000 for entering into a swap with Citibank that included an embedded written option. The swap covered a notional amount of $50 million and provided that the Company would pay a floating rate of 3-month LIBOR and Citibank would pay a fixed rate of 5.8375% from October, 1999 to July, 2005, provided, however, that no payment would be due from either party on any quarterly payment date on which 3-month LIBOR was less than 7%. In effect, the Company had sold an interest rate cap. It was exposed for six years to the risk that LIBOR would rise to or above 7%, in which case it would have to pay Citibank the difference between the fixed rate payment of 5.8375 % and LIBOR times the $50 million notional amount.

**August, 1999 Citibank Embedded Option Swap.** On August 25, 1999, the Company received a premium of $1,670,000 for entering into a swap covering a notional amount of $125 million in which it would pay a floating rate of 3-month LIBOR and receive from Citibank fixed rate payments of 5.1625% from December, 1999 to June, 2003, provided, however, that no payment would be due from

-18-

either party on any quarterly payment date on which 3-month LIBOR was below 8.25%. Again, the Company had sold an interest rate cap to Citibank.

**August 1999 Citibank Extension Option Swap**. On August 25, 1999, the Company received a cash premium of $1,351,000 for entering into a swap covering a notional amount of $85 million in which it would pay a fixed rate of 6.14% and Citibank would pay a floating rate of 3-month LIBOR from October, 1999 to October, 2001, except that Citibank had the option, exercisable by October, 2001, to extend the duration of the swap to October, 2003. In effect, this swap carried an embedded swaption.

(c)    **Terminating favorable contracts in exchange for cash settlements**.    Market

changes in interest rates occurring after a swap is in place will cause it to have a positive or

negative value, determined by the discounted present value of cash differential payments over the

life of the swap. One method that the Company used to generate cash was terminating swaps

having a positive value (to the Company) in exchange for cash payments. However, this cash

came at a price, as the termination of these swaps caused Safety-Kleen to lose whatever protection

they provided against interest rate fluctuations. Examples of this method of generating cash

included:

**July 1998 TD Bank 30-Year Swap, Terminated in May 1999**.
On July 2, 1998, the Company executed a swap with TD Bank on a notional amount of $50 million for a term of thirty years. The terms of the swap provided for the Company to pay a fixed rate of 5.965% and receive a floating rate based on LIBOR. The swap's thirty-year term far exceeded the terms of any of the Company's outstanding debt obligations. Less than a year after its entry, on or about May 14, 1999, the Company terminated the swap earlier in exchange for a cash premium of $2,041,000. There was no legitimate purpose for the Company to enter a 30-year swap, and it did so for the primary purpose of giving itself the ability to terminate the swap at a future date in exchange for cash.

-19-

**August 1998 Terminations of First Chicago and Chase Swaps.**
On August 7, 1998, the Company terminated a swap with First
Chicago Bank on a $50 million notional amount, and received
$1,031,000 in cash. Three days later, on August 10, 1998, the
Company terminated a swap with Chase, also on a $50 million
notional amount, and received $1,084,508 in cash.

**NationsBank Swap Amended May 1999 and Terminated
February 2000.** On May 29, 1999, the Company shortened the
term of a previously-entered swap from 10 years to 5 years, and
received a cash premium of $929,000. Then, on February 1, 2000,
the Company terminated the swap entirely in exchange for
$3,070,000 in cash.

**February 2000 Bank One Swap Termination**. On February 1,
2000, the Company received a payment of $3,041,400 from Bank
One for terminating a "plain vanilla" swap.

45.     During the fiscal year ending August 31, 1999, the Company used a combination

of the techniques described above to generate cash payments exceeding $35 million (i.e., over ten

percent of its operating income). Further, from September 1999 to February 2000, these methods

generated at least another $20 million.

46.     As noted above, the Company included the cash generated by its interest rate

derivative program in top line revenue. This accounting treatment was not disclosed and was

inconsistent with GAAP. First, the Company's speculative derivative activities would not have

qualified for hedge accounting; instead, GAAP required the contracts to be carried on the balance

sheet at their market value and marked to market periodically with periodic changes in value

being reflected in the income statement. Even if hedge accounting were applicable, GAAP would

have required deferral of premiums (on the swaptions and imbedded options) and deferred

treatment of gains on swap terminations (such gains would have been accreted as periodic

-20-

reductions to interest expense over the remaining life of the hedge or the hedged debt, whichever was shorter).

47.     The Company's inclusion of income generated by its interest rate derivatives activities in top line revenue was not only inconsistent with GAAP, but also materially misleading, having the effect of materially inflating revenues and gross margins with no corresponding costs. The undisclosed inclusion of speculative trading gains in top line revenue materially distorted the market's view of the Company's success in its core businesses. In addition, the notes to the Company's audited financial statements created the impression that the Company enjoyed protection from interest rate risk, when in reality its derivatives activities exposed it to substantial undisclosed risk.

48.     In the Restatement, one of the significant accounting irregularities that had to be corrected involved the inappropriate accounting for, and recognition of gain on, derivatives transactions. As the Company explained in the Restatement:

> During the restatement period [fiscal 1997 through fiscal 1999], the Company failed to record on the balance sheet, at fair value, certain derivative transactions that did not qualify for hedge accounting. In addition, the Company received cash to modify certain existing derivative instruments or to enter into new instruments that contained off-market terms. Rather than record this cash as a borrowing, the Company either improperly recognized the cash received as income immediately or improperly credited various balance sheet accounts, which were then improperly used to increase income over a period of time. Finally, the Company did not properly account for the early termination or modification of certain derivative contracts.

The Company restated its net income downward by over $49 million for fiscal 1997 through fiscal 1999 as a result of improper accounting for derivatives, including approximately $9 million to

record net mark to market losses on derivatives, and approximately $40 million to correct the improper recording of cash payments received on derivatives.

49.    During the mid-1990s, substantial attention in the financial press was being devoted to derivatives, their high-risk nature, and the problems they had caused for many companies. For this reason alone, PwC and TD Securities should have, during the course of their audits and due diligence, thoroughly investigated and reviewed the Company's derivative transactions and their potential impact upon the Company's financial condition. Similarly, the Individual Defendants should have made sure they understood the nature and risks of the Company's derivative transactions, and the accounting for those transactions, and ensured that this information was being properly disclosed to investors. However, none of the Defendants took these steps.

50.    Many of the Company's derivative contracts were with affiliates of TD Securities. In addition, TD Securities arranged the Senior Credit Facility, under which an affiliate of TD Securities was a lender, and which contained a requirement that the Company maintain interest rate protection on terms satisfactory to the administrative agent, which was yet another TD Securities affiliate. Thus, when TD Securities served as lead underwriter for the issuance of the Bonds, it knew that the Company was engaged in derivative transactions, it knew the nature of many of the Company's derivative transactions, it should have known the nature of the remainder of the Company's derivative transactions, and it knew or should have known that the nature of these transactions was being misrepresented in the Company's financial statements and offering memoranda with respect to the Bonds. Even a minimal amount of due diligence by TD Securities' underwriters would have revealed this, since they would not have had to look beyond

the information that was already in the possession of their own affiliated entities. However, no one who was involved in the due diligence process for the issuance of the Bonds ever inquired of their colleagues, or any other counterparties, as to the nature or terms of the Company's derivatives. TD Securities either failed to discover the high-risk nature of the Company's derivative transactions, or discovered it but failed to disclose it to investors or potential investors in connection with the offering of the Bonds.

51.    PwC was aware that the Senior Credit Facility required interest rate protection as part of its "Affirmative Covenants," and that it prohibited speculative derivatives as part of its "Negative Covenants." As part of its workplan for its audit of the Company's fiscal 1999 financial statements, Eric Schachner, PwC's Senior manager on the engagement, prepared a "Corporate Treasury Support Tool" which identified various issues relating to the management of interest rate exposure. Among the audit tests suggested in this document were: (1) reviewing swap documentation to ensure that swaps are plain vanilla; (2) performing sensitivity analysis on debt and the swaps to changes in interest rates; (3) confirming the existence of the swap agreements with counterparties and (4) checking the accounting treatment of premiums received or paid. PwC never took any of these steps.

52.    PwC never obtained copies of any of the Company's derivative contracts, nor did it check the accounting treatment the Company applied to them. PwC never sent confirmation letters to TD Securities or any other entity with whom the Company had entered into derivative contracts to confirm the existence or terms of these contracts, despite having represented to the Audit Committee that they would do so. Instead, a junior PwC staff accountant simply obtained a

-23-

list from the Company's management of the Company's derivative contracts, but PwC did nothing to determine if the list was complete or accurate.

53.    PwC determined that all of the Company's derivative transactions were hedging transactions, based solely on assurances from management. However, the list of derivative transactions obtained by PwC showed terms that were inconsistent with contracts done as simple hedges of interest rate exposure. For example, it showed future start dates, contained contracts with both fixed and variable rates, and included contracts with maturities up to 30 years (which was significantly longer than the term of any of the Company's debt).

54.    The Company's booking of cash proceeds from derivative transactions caused dramatic increases in the Company's interest income accounts. These entries were not difficult to detect, since they appeared as large credits to income in accounts that were outside the normal operating groups. For example, one interest income account more than doubled in a single month, jumping from $800,000 in January 1999 to $1.7 million in February 1999. PwC was given documents that reflected this increase, yet PwC never inquired as to the reasons for the increase.

55.    If PwC had conducted its audits in accordance with GAAS, it would have recognized (1) that the Company's policy of accounting for derivative instruments was not in compliance with GAAP and (2) that the Company's notes to its financial statements concerning the derivative instruments were misleading. If PwC had performed adequate substantive tests of the Company's derivative transactions, it would have known about its extensive program of generating cash through speculative interest rate derivatives activities, and would have discovered the improper manner in which Safety-Kleen was treating the cash generated in its financial statements.

-24-

56.     By issuing unqualified opinions on the Company's financial statements, PwC created the false impression that the Company's accounting for derivatives was in compliance with GAAP, and that PwC had reviewed and was satisfied with the disclosures in the notes to the financial statements, including the notes relating to the Company's derivative transactions. In fact, PwC had no basis for judging the accuracy of those disclosures.

**Landfill Accounting and Environmental Liabilities**

57.     The Company's landfills were divided into "cells," with each cell capable of handling a particular volume of waste. Under GAAP, the Company was required to provide reserves to cover the costs of closing each cell. The Company's environmental engineers calculated the amount of its reserves for closing costs, based in part on the total upfront construction costs of the cells. GAAP requires that closure costs be determined on an individual cell basis and that the costs be amortized over the life of the cell.

58.     Prior to the Rollins Acquisition, PwC (then Coopers) was aware that, instead of complying with GAAP, Laidlaw and Old LES had applied the "pooling" approach to determining closure costs. Under "pooling," the Company calculated the amortization of landfill space based on a weighted average cost of all the landfills that were owned, instead of establishing amortization rates on a cell-by-cell basis. In 1995, Coopers' Canadian affiliate informed Defendant Haworth and Laidlaw that the pooling method was not acceptable. During fiscal 1996, Coopers' Canadian affiliate proposed a $10 million adjustment for Old LES to reverse the pooling-related entries. The adjustment was not made, and the $10 million error carried over into fiscal 1997.

-25-

59.    Old LES and then LES continued to use the pooling method through fiscal 1997, resulting in lower amortization cost, and higher net income, than should have been recorded under GAAP. By the end of fiscal 1997, there were $15.3 million in cumulative errors due to the improper use of pooling, including $5.3 million from fiscal 1997 itself and $10 million from prior years. PwC initially proposed that the Company correct the entire $15.3 million misstatement in its fiscal 1997 financial statements. Management declined to do so, and PwC identified this issue as a "critical matter" in its fiscal 1997 audit. Ultimately, rather than require the Company to correct the entire $15.3 million in errors in fiscal 1997 as required by GAAP, PwC allowed the Company to implement a "correcting plan" whereby the error could be written off over a ten-year period. This "correcting plan" violated GAAP.

60.    PwC never considered whether it would have made a material difference to the Company's financial statements if the Company had recorded the entire $15.3 million adjustment in fiscal 1997 instead of pursuant to a correcting plan. Moreover, although $5.3 million of the error clearly related to fiscal 1997, PwC did not even require that $5.3 million to be corrected in fiscal 1997. This is in spite of the fact that a $5.3 million adjustment would have affected the income statement by a magnitude of thirty times greater than PwC's $150,000 materiality threshold for income statement adjustments.

61.    Not only did PwC approve an improper "correcting plan," but it then failed to ensure that the Company followed the plan. In fact, the Company did not follow the plan. Instead, the $15.3 million correction was capitalized and written off as part of the net book value of the landfills over the life the landfills, which far exceeded ten years. Therefore, the correction

-26-

of this error had a minimal impact on the Company's net income each year, whereas under GAAP the Company should have taken a $15.3 million reduction in net income in fiscal 1997.

62.    The Company also violated GAAP in its determination of the economic useful lives of its landfills for purposes of amortizing of landfill costs.  The economic useful life of a landfill is measured by the estimated amount of waste the landfill can accept, expressed in terms of airspace capacity.  Airspace capacity should be measured based on airspace for which the Company presently holds permits, plus airspace for which the Company will probably obtain permits in the future.  GAAP requires a company to follow a systematic and rational approach in evaluating the probability of obtaining future permits, so decisions concerning airspace capacity for amortization purposes are consistent from period to period.

63.    The Company had no systematic or rational approach for estimating airspace for which future permits were probable.  Instead, the Company included all possible future airspace within the landfill "footprint" when determining the landfill's useful lives.  As a result, the Company amortized its landfill costs over excessive and unreasonable periods of time, thereby understating expenses and overstating net income.  PwC never independently evaluated the probability of obtaining permits, and instead relied solely on management's undocumented thought process that the Company was likely to get permits.

64.    The Company also failed to create adequate reserves for environmental liabilities. PwC was aware that the Company was subject to strict liability for certain environmental remediation costs, and that it needed to produce accurate estimates of those costs.  Under GAAP, environmental remediation liabilities should be recorded when it is probable that the Company is responsible for participating in a remediation process and the amount can be reasonably estimated.

-27-

The Company accrued for remediation costs for periods of only 5 to 10 years, substantially less than the period of their responsibility. As a result, the Company understated its costs and overstated its net income.

65.    The Company also used numerous other improper accounting methods in accounting for landfills and environmental liabilities. In the Restatement, the Company stated:

> The Company determined that the landfill accounting model used in preparing its previously issued financial statements included errors relating to (i) estimates of the probable capacities of the Company's landfills (also referred to as "airspace") to be used in accounting for the costs of those properties, (ii) estimates of landfill final closure and post-closure costs, (iii) the misapplication of certain landfill amortization and accrual rates, (iv) the improper capitalization and/or deferral of certain costs, and (v) other mathematical and clerical errors.

> The Company also concluded that it had improperly determined and recorded accruals for environmental remediation, Superfund obligations, and non-landfill closure and post-closure obligations. These included errors related to the reconciliation of the Company's estimates of these obligations to the amounts included in its previously reported financial statements.

66.    The correction of the Company's improper accounting for landfills and environmental liabilities resulted in a downward restatement of net income for fiscal 1997 through fiscal 1999 of over $58 million. In addition, the Restatement adjustments in these areas had a negative impact of more than $94 million for periods prior to fiscal 1997.

**Improper Revenue Recognition**

67.    In December 1997, the Company sold a subsidiary called ECDC Environmental L.C. ("ECDC") to Allied Waste Industries, Inc. ("Allied Waste"). As part of the sale, the Company was to receive additional amounts (the "Contingent Purchase Price") if certain

-28-

conditions were met, including cash flow requirements and the awarding of a specific contract to ECDC. The Company recorded $8 million of the Contingent Purchase Price as revenue in fiscal 1999, and PwC noted in its workpapers that the conditions in the contract were satisfied. However, PwC made no effect to confirm that the conditions had been satisfied. In fact, the Company never satisfied the conditions necessary to receive the Contingent Purchase Price, and it never received the $8 million it recorded as revenue. PwC was reckless in failing to discover that this amount was improperly recorded. This $8 million entry was reversed in the Restatement.

68.     During fiscal 1999, the Company improperly booked $6.3 million in revenue and $3.15 million in expenses twice, thereby overstating net income by over $3 million. Also in fiscal 1999, the Company recorded $3.5 million in revenue from a sale of property that never closed. PwC was aware of these entries, and that they were in clear violation of GAAP, and PwC recommended correcting adjustments to both management and the Audit Committee. Management and the Audit Committee (with Haworth participating) declined to make the adjustments, yet PwC still issued an unqualified opinion. These improper entries were reversed in the Restatement.

69.     Safety-Kleen transacted business with the Company's Canadian affiliate, Safety-Kleen Canada. Typically, inter-company transactions are recorded in separate accounts on the respective entities' books so those transactions can be readily identified and the inter-company profit eliminated, as required by GAAP. Safety-Kleen, however, recorded its inter-company transactions in the same accounts as transactions with third parties, and did not eliminate them from inter-company profit, in violation of GAAP.

-29-

70.     PwC was aware that a problem existed with intercompany transactions as far back as 1997. During the course of its audit for that year, PwC reported that activity between LES's facilities in Canada and the United States had greatly increased, but that receivables and payables between those facilities were being included in regular trade accounts rather than in intercompany accounts.

71.     The Company also did not use a consistent method of recording revenue from its waste collection and disposal services. Under GAAP, revenue should have been recorded at the time the waste was disposed of. The Company did so for some operations, but for other operations revenue was recorded at the time the waste was collected. This was contrary not only to GAAP, but also to the Company's own description of its revenue recognition practices in the notes to its published financial statements for fiscal 1997 through fiscal 1999, audited by PwC, which stated:

> Revenue from treatment and disposal operations, primarily landfill and incineration facilities, is recognized when the waste material is disposed of, whether burned, land-filled or treated.

72.     In the Restatement, the Company stated:

> The Company determined that, for waste collection and disposal activities, revenue should be recognized at the time of disposal of the waste, and for the parts cleaner and related operations, revenue should be recognized over the service interval. During the restatement years, the Company previously recognized revenue at the time of collection for certain operations (including an accrual for the cost to dispose), and at the time of disposal for certain other operations. The Company made adjustments to consistently apply the appropriate revenue recognition policy in accordance with [GAAP], including the reversal of revenue accrued improperly.

73.    The Restatement adjustments to correct improper revenue recognition had the effect of decreasing net income by approximately $33 million over the Restatement period. In addition, the Restatement adjustments in this area had a negative impact of more than $37 million for periods prior to fiscal 1997.

**Extended Amortization**

74.    As part of its business for the retrieval and clean-up of oil, fluids and chemicals, the Company placed parts cleaners and other equipment at customers' locations, as well as at the Company's own treatment centers and landfills. Under GAAP, companies in the waste management business are required to depreciate the costs of their equipment over their actual useful lives. GAAP also requires companies to conform their method of calculating depreciation to industry norms unless there is a compelling reason for different accounting treatment. If such a compelling reason exists, GAAP requires footnote disclosure to explain such a departure.

75.    During the Restatement period, the useful lives for virtually all of the Company's long-lived capital assets were extended to upwards of thirty (30) years which grossly exceeded the economic lives of those assets and which represented a major departure from industry norms. The effect of the "useful life" extensions was to reduce depreciation and amortization expense which, in turn, artificially increased reported earnings. No disclosure of this departure from industry norms, or the reason for such departure, was made.

76.    PwC was well aware of the Company's aggressive accounting practices regarding depreciation. In its "Business Assurance Client Acceptance Form" for the fiscal 1997 audit, PwC stated that "management is very competent and has always been honest with [PwC], although they are often aggressive with accounting matters." During the same audit engagement, PwC prepared

-31-

a memo which updated certain 1996 issues. In the memo, PwC stated that LES had extended the depreciable lives on virtually all long lived assets, which resulted in 1996 depreciation expense being $1,700,000 less than would have been recognized under the old lives. PwC further noted that the fiscal 1997 depreciation expense had been calculated using the same lives as in 1996. In preparation for the 1998 audit, PwC prepared a "Business Risk Assessment" which also discussed the Company's depreciation practices. In the section entitled "Integrity and Ethics" PwC stated: "[T]he company has historically used aggressive accounting practices related to depreciation and purchase price allocation." Nonetheless, PwC did not challenge or question the extensions of the useful lives by the Company.

**Improper Capitalization of Expenses**

77.    During the Restatement period, the Company's net income was materially overstated as a result of the improper capitalization of costs that should have been recorded as expenses. For example, the Company capitalized the amounts spent on tires and diesel fuel to run the Company's trucks and other equipment, thereby artificially increasing reported income. Those amounts should have been charged as expenses, thereby reducing reported income, under GAAP.

78.    In the Restatement, the Company explained that it had "determined that certain costs and expenses related to software, repair and maintenance, marketing, startup losses, vehicle fuel and tires, inventory and consulting fees were improperly capitalized or deferred." The Restatement adjustments to correct this incorrect capitalization of expenses resulted in a decrease in net income of over $33 million for fiscal 1997 through fiscal 1999.

-32-

**Improper Capitalization of Interest Expense**

79.    During fiscal 1997, the Company capitalized interest on the cost of landfill cells that were not yet under development. PwC's engagement partner, Robert Hoppe, considered this to be "creative" and "aggressive" accounting, and during the fiscal 1997 audit PwC's national office concluded that it did not comply with GAAP. However, PwC did not propose an adjustment, thereby allowing the Company's financial statements to remain misstated. The Company persisted in its improper interest capitalization in fiscal 1998. In the Restatement, the Company reversed the capitalization of landfill interest expense, reducing income by approximately $2.5 million for fiscal 1997 and $500,000 for fiscal 1998.

80.    The Company also capitalized interest that it attributed to its initial investment in Old Safety-Kleen prior to ultimately acquiring its controlling interest. PwC concluded during its review of the third quarter fiscal 1998 financial statements that there was no basis under GAAP to capitalize interest during a holding period prior to an acquisition. PwC proposed a $925,000 adjustment during the fiscal 1998 audit to reverse the entry, but management and the Audit Committee declined to make the adjustment. The full amount was later reversed in the Restatement.

**Harbor Dredging Operations**

81.    In fiscal 1998 and fiscal 1999, the Company improperly recorded revenues for contingent claims relating to its harbor dredging business. These claims sought compensation for cost overruns on harbor dredging contracts. GAAP does not permit such claims to be recorded as revenue unless it is probable that the claim will result in additional revenue and the amount can be reasonably estimated. The evidence supporting the claim must be objective and verifiable, not

-33-

based on unsupported representations by management. Rather than conduct an analysis of the probability of recovery or the amount that could reasonably be expected, the Company recorded the full amount of its claims, with no reserve.

82.     PwC was aware that these types of claims were typically denied, that they would likely require several years of litigation, and that they would likely be settled for less than the full amount. Because the claims were subject to litigation, GAAS required PwC to confirm their collectibility with counsel. PwC's in-house counsel declined to provide PwC with an opinion on collectibility. PwC was aware that the Company had outside counsel who dealt with its harbor dredging claims, but PwC never contacted that counsel for an opinion regarding the claims. Instead, PwC issued an unqualified opinion despite the inclusion of the full amount of the harbor dredging claims in revenue, based solely on management's assessment that the full balance of the claims was collectible.

83.     In the Restatement, the Company explained the accounting errors relating to harbor dredging as follows:

> In its previously issued financial statements, the Company improperly recorded revenue for governmental contract claims which have not been collected and for other contingent revenues. To a lesser extent, the Company also capitalized certain operating costs, improperly recorded purchase accounting reserves for operating inefficiencies and contingencies and did not appropriately accrue various costs related to its harbor dredging operation.

84.     The Restatement adjustments relating to the harbor dredging operation decreased the Company's reported net income by more than $10 million for fiscal 1998 and by more than $42 million for fiscal 1999.

-34-

**Restructuring Charges**

85.     At the end of the third quarter of fiscal 1998, ended May 31, 1998, the Company wanted to record a $65 million restructuring charge, purportedly relating to the closure of facilities and lay-offs of employees.  GAAP requires a company to have a plan that specifically identifies the facilities to be closed, and the number and type of lay-offs to occur, before such a charge may be recorded.

86.     When PwC reviewed the proposed charge, it determined that the charge could not be recorded under GAAP unless the Company identified the facilities to be closed.  PwC requested a representation letter from management stating that the Company had identified the facilities as of May 31, 1998, that the closures would commence within the next year, and that no significant changes in the plan were anticipated.   Management declined to provide the representation letter.

87.     When no representation letter was provided, PwC determined that the components of the restructuring charge did not meet the requirements of GAAP.  At that point, the Company's management agreed to reverse the charge in the quarterly financial statements.  However, that decision was soon reversed by the Audit Committee.

88.     On July 7, 1998, PwC's engagement partner, Robert Hoppe, informed the Audit Committee that PwC did not approve of the restructuring charge.  Defendant Tippie, on behalf of the Audit Committee, informed PwC that the charges would be recorded in the Company's third quarter financial statements anyway.  PwC's audit team then consulted with PwC's national office, and it was decided that PwC would not issue a quarterly review report due to the Company's

insistence on recording unsupported restructuring charges. The Company filed its Form 10-Q for the quarter anyway.

89.     The financial information from the third quarter of 1998 was to be included in the registration statement for bonds issued in May 1998 (the "2008 Bonds"). PwC's national office concluded that PwC should not consent to the inclusion of its audit opinion in that registration statement unless the restructuring charge was reversed.

90.     Before the registration statement for the 2008 Bonds was issued, however, the Company came up with a purported need to increase the environmental accruals for the Company's Lexington, South Carolina facility, which was one of the facilities slated to be closed. Conveniently, the increase offset the components of the restructuring charge that PwC had found objectionable. PwC's auditors then consented to the inclusion of their opinion in the registration statement, after doing nothing to confirm or test the "new" accruals except talk to a single Safety-Kleen employee about them. PwC did not apply the level of professional skepticism that was required under GAAS under these circumstances. PwC also either intentionally ignored or recklessly overlooked the fact that the Safety-Kleen employee, Geoff Jones, told them that Safety-Kleen was not responsible for the entire amount which had been presented to PwC, but only for a portion thereof. In fiscal 1999, after the 2008 Bond offering was completed, the Company reduced the accruals for the Lexington, South Carolina facility from $13 million to $2.9 million.

91.     The Company also recorded a restructuring charge in fiscal 1997, in the amount of $331.8 million, purportedly related to the closure of redundant facilities and impairment in certain facility values following the Rollins Acquisition. The restructuring charges for both fiscal 1997 and fiscal 1998 included accruals for severance and exit costs which did not meet the criteria

-36-

under GAAP for inclusion in a restructuring charge. In fact, the restructuring charges included items that constituted operating expenses, asset impairments, and asset write-offs which did not relate to exiting business activities. Classifying these items as restructuring charges gave the false appearance that they were one-time charges as opposed to recurring operational items, thereby creating the impression that operating results were better than they really were.

92. In the Restatement, the Company stated:

> The Company recorded and classified certain costs and expenses as restructuring and other charges in 1997 and 1998. Included in these amounts were accruals for severance and exit costs as defined in Emerging Issues Task Force ("EITF") 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." The Company has determined it had not committed to restructuring plans which met the requirements of this standard. Accordingly, certain of these charges have been reversed.

> The remaining components of the previously reported restructuring and other charges represent proper costs and expense in the periods previously reported but have been reclassified to other income statement captions, primarily to impairments and other charges ... and to operating expenses.

## Purchase Accounting

93. The Company accounted for both the Rollins Acquisition and the Safety-Kleen Acquisition using the purchase method of accounting. Under this method, when two entities are combined into one, the acquiring entity must allocate the cost of the acquisition to tangible and intangible assets at fair value. If the total costs exceeds these tangible and intangible assets, the difference (excess purchase price) is recorded as goodwill.

94. In the Rollins Acquisition, there was an excess purchase price of approximately $262 million. The Company allocated the entire amount to permits, rather than goodwill. Based

-37-

on cash flow projections prepared by management in fiscal 1997, however, the justifiable permit values totaled only $57 million.

95.     In the Safety-Kleen Acquisition, there was an excess purchase price of approximately $1.7 billion, of which the Company allocated $1.156 billion to permits. That allocation was based on a calculation by Defendant Humphreys that applied the historical experience of LES to Old Safety-Kleen, despite the differences in their lines of business.

96.     As part of its accounting for the Rollins Acquisition and the Safety-Kleen Acquisition, the Company also recorded the assumption of substantial liabilities. The recording of reserves for liabilities in purchase accounting is rife with the potential for abuse. By setting up excessive reserves, sometimes called "cookie jar reserves," a company can give itself the ability to artificially improve future earnings by taking charges against those reserves. The Company established excessive reserves in connection with both of its acquisitions, including but not limited to the following:

a.    In the Rollins Acquisition, the Company booked a $4.635 million turnaround reserve for future general repair costs. PwC informed management and the Audit Committee that this reserve should not be recorded, but it was recorded anyway, and PwC issued an unqualified opinion. The reserve was reversed in the Restatement.

b.    In the Rollins Acquisition, the Company recorded an $11.6 million litigation reserve which was based on the maximum potential exposure (including legal fees), without regard for the probability of success. PwC noted in its workpapers that this reserve was excessive, and that the total estimated liability was closer to $6 million. In the Restatement, nearly $11 million of this reserve was reversed.

c.    The Company recorded a $17 million severance accrual in the Rollins Acquisition, of which $5.9 million related to severance for employees of LES rather than employees of Rollins, and thus was prohibited by GAAP.

-38-

PwC did nothing to determine whether the accrual included severance being paid to LES employees.

d.    The Company recorded a general reserve of $8.25 million in the Rollins Acquisition that did not relate to a specific facility and thus was prohibited by GAAP.

e.    The Company recorded a general contingency reserve of $10 million in the Safety-Kleen Acquisition that did not relate to a specific liability and thus was prohibited by GAAP.

f.    The Company recorded $22 million in excessive environmental reserves in the Safety-Kleen Acquisition.

g.    The Company recorded accrued severance costs of $29 million in the Safety-Kleen Acquisition purchase accounting. Of that amount $24 million was for "stay-put" bonuses which did not qualify as purchase price adjustments under GAAP. PwC never looked at the documentation regarding these severance costs, and never discovered that it included "stay-put" bonuses.

97.    In the Restatement, the Company described the adjustments related to purchase

accounting as follows:

> The Company determined that it had improperly accounted for its acquisitions between September 1, 1996 and August 31, 1999, primarily related to the Rollins Acquisition and the Old Safety-Kleen Acquisition. A substantial portion of these errors were the result of the inappropriate establishment and use of certain reserves in accounting for these acquisitions. Corrections of previously recorded reserves related primarily to estimated liabilities for legal, severance, environmental and future maintenance costs.
>
> Less significantly there were also errors in the valuation of certain acquired intangible assets and related deferred tax liabilities. These errors primarily consisted of overstatements of values assigned to permits and corresponding understatements of values assigned to goodwill in connection with the Rollins Acquisition in 1997 and the acquisition of Old Safety-Kleen in 1998 ....

-39-

98.     The Restatement adjustments to correct the Company's improper purchase accounting reduced the Company's net income by more than $170 million for fiscal 1997 through fiscal 1999 ($17.7 million in fiscal 1997, $85 million in fiscal 1998, and $67.9 million in fiscal 1999).

**Fictitious Revenue Entries and Adjustments**

99.     In connection with the Rollins Acquisition, the Company established an account entitled "Account 2050 - Accounts Payable - Other" to record environmental liabilities established in purchase accounting. The Company soon (in fiscal 1997) began using this account to record more than environmental liabilities, and by the end of fiscal 1999, thousands of unsupported entries had been made in this account, many of them in large, round dollar amounts. These were strictly paper entries for which no money was ever exchanged, and for which there was no supporting documentation. Virtually all of them had the effect of artificially increasing revenue or income.

100.     In auditing the 2050 account, PwC reviewed sub-accounts and made inquiries of management. No one denied PwC access to the books reflecting entries into this account. Yet, PwC never detected the unsupported entries in this account.

101.     Also during this period, numerous accounting adjustments were recorded on the Company's books at the very end of a quarter. Like the journal entries for fictitious transactions, many of these adjustments lacked any factual justification, were not supported by competent evidential matter, and had the effect of artificially inflating the Company's financial results.

-40-

102.    Virtually all of the fictitious journal entries and quarter-end adjustments were made at the corporate level – either by Winger or Humphreys personally, or by other Safety-Kleen personnel at their express direction – in the Company's Columbia, South Carolina offices.

103.    The Company's finance staff generated multiple "runs" of the Company's financial statements each month and quarter, each reflecting progressively more corporate-level adjustments which had the effect of improving earnings. There were upwards of ten runs each accounting period, and the changes from one run to the next were material. For example, for the month of May 1999, the ninth run reported earnings before interest, taxes, depreciation and amortization ("EBITDA") of $16.7 million, whereas the "final" run showed EBITDA of $84.5 million after numerous corporate-level adjustments were made. In at least some quarters, the financial results were adjusted even further upwards from the "final" run before the financial statements were published.

104.    Defendants Winger, Humphreys, Bragagnolo and Haworth received copies of the preliminary runs. Haworth admitted during a March 2000 Board meeting that he had routinely received as many as eighteen "flash reports" per quarter, reflecting corporate-level adjustments. The preliminary runs were discussed during monthly operational meetings attended by, among others, Winger, Humphreys and Bragagnolo. The preliminary runs were also available to PwC, TD, and the Audit Committee, had they requested such information.

105.    In July 1999, there were so many fictitious and unsupported entries in the Company's books that the Company's accounting department undertook to reverse all of those entries, so "uncooked" financial statements could be "given to the guys upstairs" to show them what the Company's real financial results were. Then, in August 1999, those adjustments were

-41-

booked yet again, so as to return the books to their prior "cooked" condition.  Defendants

Humphreys, Winger and Bragagnolo received this information, which showed that the Company's

"true" EBITDA was more than $100 million less on a cumulative basis than what they were

representing to the public.

## Other Asset and Liability Adjustments

106.    In the Restatement, the Company also reported that numerous additional

adjustments were required to correct improper accounting for assets and liabilities:

> During the restatement period, the Company failed to record
> adjustments necessary to reconcile cash, inventories and property,
> plant and equipment to supporting records and/or physical counts.
> The Company also improperly recorded amortization of permits and
> deferred losses related to disposals of property, plant and
> equipment.  In addition, the Company recorded inappropriate
> receivables related to unearned interest and finance charges on
> accounts and notes receivable and provided inadequate allowances
> for doubtful accounts.  Additionally, the Company inappropriately
> capitalized various expenses as prepaid or deferred costs and failed
> to approximately recognize equity in earnings related to investments
> in affiliates.  Finally, adjustments for certain asset impairments
> resulting from the Company's decisions to sell, close or alter the use
> of various facilities were not appropriately recorded in its previously
> issued financial statements.

                    *        *        *

> The Company determined that during the restatement period, it had
> inappropriately reversed or recorded charges against certain
> liabilities or inadequately provided for various accrued liabilities,
> including vacation, medical costs, legal actions against the
> Company, incentive programs and sales commissions.

107.    The Restatement adjustments related to these asset and liability adjustments

resulted in a $168 million decline in net income for fiscal 1997 through fiscal 1999 ($23 million

in fiscal 1999, $64 million in fiscal 1998, and $81 million in fiscal 1999).

-42-

**The Systems Conversion**

108.    Beginning immediately after the Safety-Kleen Acquisition, the new management of Safety-Kleen (including defendants who were former members of LES management) directed that Old Safety-Kleen's accounting and information systems be scrapped and replaced by LES's former systems, even though LES was less than half the size of Old Safety-Kleen and its systems were ill-equipped to meet the combined entities' needs. This fact, together with the fact that Old Safety-Kleen's experienced accounting personnel were terminated after the Safety-Kleen Acquisition, resulted in Safety-Kleen failing to meet its weekly payroll four times during the Summer of 1998 because it could not process paychecks.

109.    After the Safety-Kleen Acquisition, the defendants forced Old Safety-Kleen to convert its accounting systems, which handled 500,000 customers and 5 million transactions per year, to LES's accounting system (PeopleSoft). The LES system was not equipped to handle the volume of transactions that the combined LES/Safety-Kleen entity would generate.

110.    During and after the PeopleSoft conversion, Safety-Kleen had a materially significant problem with accounts receivable because the new system could not tell which customers had paid their invoices. In one Illinois branch, there were about $2 million worth of invoices that had been paid but could not be reconciled to specific customers. Safety-Kleen blindly deposited the checks and kept billing its customers. When customers complained, Safety-Kleen management directed branch personnel to tell their customers as little as possible and state that it was an isolated incident, even though the branch personnel knew otherwise.

111.    By August 1999, the Company had approximately $45 million in cash that had been received as payments from customers, but that it was unable to apply against individual

-43-

accounts due the system conversion problems. In addition, the Company had suspended all of its

collection efforts as of the end of fiscal 1999. Yet, no disclosure of these system integration

problems was made in the fiscal 1999 financial statements. To the contrary, the Company

continued to represent that its integration following the Safety-Kleen Acquisition was proceeding

smoothly.

112.    As a result of Safety-Kleen's system conversion problems, the Company's reported

financial results for fiscal 1998 and fiscal 1999 were materially misstated. For example, the

Company's reported accounts receivable and revenues were overstated, since revenue was being

recorded as customer payments were received, but accounts receivable were not being taken off

the books since the Company could not match payments with particular receivables.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN CONNECTION WITH ISSUANCE AND SALE OF THE BONDS

113.    As a result of all of the foregoing accounting violations and issues, among others,

the financial statements of LES and Safety-Kleen were materially misstated during fiscal 1997,

fiscal 1998, fiscal 1999, and the first quarter of fiscal 2000. In particular, the Company's

earnings, revenue and income figures were materially overstated.

114.    The fiscal 1997, 1998 and 1999 audited financial statements and accompanying

audit opinions have been withdrawn by Safety-Kleen and PwC, respectively, because those

entities admit they contained material inaccuracies and should not be relied upon. PwC's

engagement partner for the Company's audits, Robert Hoppe, has admitted under oath that the

Company's fiscal 1997, 1998 and 1999 audited financial statements were false. Tippie and

Wareham have also testified under oath that these financial statements, the Registration

-44-

Statements and Forms 10-K which they signed, as well as PwC's audit opinions therein, were materially false and misleading.

115.   In addition to the financial statements of LES and Safety-Kleen and the audit opinions of PwC, a number of other statements made by Defendants regarding the Company's financial condition were materially false and misleading due, in substantial part, to the accounting practices and materially misstated financial results discussed herein.

116.   These false and misleading financial statements infected the entire process by which Defendants issued the Bonds, as well as the secondary market for the Bonds. As the Defendants knew and understood, the ability of Safety-Kleen and LES to service their debt was of paramount importance to prospective purchasers of the Bonds. In marketing the Bonds, the Defendants highlighted pro forma EBITDA and adjusted EBITDA calculations. These figures were materially false and misleading because they incorporated the misleading historical data.

117.   In addition to providing false and misleading financial information relating to the Company, the Defendants marketed the Bonds without disclosing material facts. These omissions lulled investors into a false sense of the reliability of the information upon which they based their decision to buy the Bonds. For example, none of the Defendants disclosed that the Company was engaged in high-risk derivative transactions, or that the Company was engaged in numerous aggressive and unsupported accounting practices which adversely affected the reliability of the Company's financial statements. To the contrary, the Company's financial statements – on which PwC issued unqualified opinions – falsely stated that the Company's derivative contracts were reducing its interest rate risk, that the gains or losses on those contracts were being accounted for

-45-

as adjustments to interest expense (as GAAP required), and that the financial statements were otherwise presented in accordance with GAAP.

118.    As the Company's independent auditors, PwC was responsible for reviewing the Company's accounting practices and providing an opinion as to whether those practices comply with GAAP. In conducting its audits, PwC intentionally or recklessly failed to recognize and/or report the misrepresentations and omissions in the Company' financial statements, and issued unqualified audit opinions on the financial statements of the Company for the fiscal years ended August 1997, 1998 and 1999, falsely certifying their compliance with GAAP.

119.    TD Securities likewise was responsible, as a lead underwriter for the issuance of the Bonds, for conducting due diligence regarding the Company and its financial condition, and for ensuring the accuracy and completeness of the Company's Offering Memoranda and Registration Statements. If TD Securities had not been reckless when conducting due diligence in connection with the offerings of the Bonds, it would have known about the Company's system conversion problems and the accounting manipulations alleged herein, it would also have detected the material misstatements in the Company's financials, and it would have ensured that the true facts were disclosed to investors. TD Securities should have detected these misstatements, since it and its affiliates: (a) were lenders to the Company, (b) served as the Company's primary bank, and (c) participated in and had direct knowledge of the Company's derivative transactions. TD Securities either did not detect the misstatements, or detected them but failed to disclose that information. TD Securities led investors to believe that adequate due diligence had been performed in connection with the issuance of the Bonds, when in fact it had not.

## THE DEFENDANTS PUMP
## FALSE INFORMATION INTO THE MARKET

120.    On October 6, 1998, LES (d/b/a Safety-Kleen) issued a press release to announce

its "record" operating results for the fourth quarter and fiscal year ended August 31, 1998.

According to the press release, for the fourth quarter of 1998, the Company's revenues totaled

$435 million, up 107% from the fourth quarter of the previous year, and the Company realized net

income of $21.8 million, or $0.06 per share, as compared to revenues of $210 million and

earnings per share of $0.04, for the same period the prior year.  For the twelve months ended

August 31, 1998, reported revenues totaled $1.185 billion as compared to $678.6 million reported

in the prior year, representing a 75% increase.  Summarizing the results, Winger stated:

> The combination of the Companies continues to proceed as planned
> and we are extremely pleased with all aspects of the integration.
> Significant cost savings have been achieved to date, as evidenced by
> the increase in operating income margins from 15.2% in the third
> quarter to 18.2% in the fourth quarter of 1998. . . .

121.    On October 29, 1998, LES (d/b/a Safety-Kleen) filed with the SEC its Form 10-K

for the year ended August 31, 1998 (the "1998 10-K").  The 1998 10-K, which was signed by

Defendants Bullock, Winger, Humphreys, Haworth, Tippie, and Wareham, contained the

previously announced financial results and reported that the Company had recorded revenues of

$1,185,473,000, operating income of $120,392,000 and income per share of $0.05 from

continuing operations for the fiscal year ended August 31, 1998.  The financial results in the 1998

10-K were audited by PwC, which rendered an unqualified opinion on those financial results

which was included in the 1998 10-K with PwC's consent:

> In our opinion, the accompanying consolidated balance sheets and
> the related consolidated statements of income, cash flows, and

-47-

changes in stockholders' equity present fairly, in all material
respects, the financial position of Safety-Kleen Corp. and its
subsidiaries at August 31, 1998 and 1997, and the results of their
operations and their cash flows for each of the three years in the
period ended August 31, 1998, in conformity with generally
accepted accounting principles. . . . We conducted our audits of
these statements in accordance with generally accepted auditing
standards which require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free
of material misstatement. . . . We believe that our audits provide a
reasonable basis for the opinion expressed above.

122.    Besides containing financial results that were materially misstated as a result of the

improper accounting practices alleged herein (among others), the 1998 10-K contained the

following materially false or misleading statements, among others, regarding the Company's

accounting practices:

(a)    "All significant intercompany balances and transactions have been

eliminated in consolidation;"

(b)    "The Company accrues for estimated closure and post-closure costs over

the life of the landfill site as capacity is consumed. The Company accrues for costs associated

with environmental remediation obligations on a site basis when such costs are probably and

reasonably estimable;" and

(c)    "Depreciation and amortization of . . . property, plant and equipment is

provided substantially on a straight-line basis over their estimated useful lives. . . ."

123.    On January 5, 1999, Safety-Kleen issued a press release announcing its results for

the first quarter of 1999, the period ending November 30, 1998. According to the press release,

for the first quarter of 1999, the Company reported revenues of $467 million, and net income of

-48-

$27.8 million, or $0.27 per share.  Defendant Winger commented on the results in pertinent part

as follows:

> This has been a very active quarter for the Company.  I am pleased
> with the progress we have made to date in achieving the integration
> benefits available with the Safety-Kleen acquisition.  The increase
> in operating income margins from 15.2% in the third quarter of
> 1998 to 18.2% in the fourth quarter of 1998 and to 19.3% in the first
> quarter of 1999 reflects this progress.  Revenue grew 7.4% in the
> first quarter of 1999 over the preceding quarter as a result of event
> business increasing to more normal levels and growth in our
> Collection and Recovery services.

124.    On January 14, 1999, the Company filed a Form 10-Q with the SEC for the first

quarter of fiscal 1999, the period ending November 30, 1998, which was signed by defendants

Winger and Humphreys and contained the same financial results announced on January 5, 1999.

In addition, the Form 10-Q also contained, among other things, the following materially false and

misleading statement.

> The accompanying interim consolidated financial statements have
> been prepared in accordance with the instructions to Form 10-Q and
> Rule 10-01 of Regulation S-X. . . .  In the opinion of management,
> all adjustments considered necessary for a fair presentation of the
> interim period results have been included; all such adjustments are
> of a normal recurring nature.

125.    On January 22, 1999, William Hoffman of TD Securities issued a "BUY"

recommendation on Safety-Kleen's Bonds.  The Update stated that the recommendation was

"based on improving operating margins, potential for further debt reduction and attractive value

relative to Allied Waste and other industrial credits.  Reinforcing our opinion is Safety-Kleen's

stable business profile and high barriers to entry."  The Update also highlighted Safety-Kleen's

purportedly improving cash flow and credit position:

-49-

We believe that Safety-Kleen should have potential for additional
spread tightening of approximately 50 to 75 basis points in the
intermediate term, despite seasonally lower expected cash flow in
the second quarter. Leverage has improved to 4.4 times relative to
run rate EBITDA from 4.9 times in the company's fiscal fourth
quarter (August 30, 1998). In addition, significant free cash flow
and the proceeds from asset sales should enable the company to
continue to improve its credit position. However, we also believe
that the company is likely to make additional acquisitions to bolster
its revenue growth, which could slow its pace of de-leveraging in
the near term. Safety-Kleen 9.25% Senior Subordinated Notes are
currently indicated at an offered price of 105.5 to yield 8.3%, a 360
basis point spread to Treasuries.

126.    On March 30, 1999, Safety-Kleen issued a press release announcing its results for

the second quarter of fiscal 1999, the period ending February 28, 1999. According to the press

release, for the second quarter of 1999, the Company reported revenues of $402.1 million and net

income of $18.2 million, or $0.19 per share, as compared to revenues of $173.2 million and

earnings per share of $0.08, for the same period the prior year, representing a revenue increase of

132%. Defendant Winger commented on the results in pertinent part as follows:

I am quite satisfied with the Company's acquisition integration
progress. We have raised our target for cash synergy's to $165
million and expect to achieve this annualized level during the
second half of this fiscal year. We are seeing year-to-year price and
volume growth of just under four percent from the Company's
former operations and growth rates from the acquired Safety-Kleen
operations of 7-8%. These revenue growth rates should accelerate
by the end of this fiscal year as our sales and service personnel are
now armed with the most complete menu of service offerings in the
industry.

127.    On April 14, 1999, the Company filed a Form 10-Q with the SEC for the second

quarter of 1999, the period ending February 28, 1999, which was signed by Defendants Winger

and Humphreys and contained the same information announced on March 30, 1999. In addition

-50-

to the foregoing, the Form 10-Q also contained, among other things, the following materially false and misleading statement:

> The accompanying interim consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulations S-X. . . . In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included; all such adjustments are of a normal recurring nature.

128.    All of the foregoing statements regarding the Company's financial results were materially false and misleading as a result of the accounting manipulations alleged herein. In addition, the Company's statements regarding its actual and projected synergistic cost savings were materially false and misleading, because they were based upon inaccurate historical financial results.

## SAFETY-KLEEN ISSUES $225 MILLION OF BONDS TO FILL LAIDLAW'S COFFERS

129.    In early 1999, Laidlaw decided to sell the PIK debenture. Bullock informed Winger that Laidlaw thought Safety-Kleen should purchase the PIK from Laidlaw. Winger then negotiated on behalf of Safety-Kleen for the price at which Safety-Kleen would repurchase the PIK, while Bullock negotiated for Laidlaw. However, Bullock received from Winger the same information that other members of the Board were provided to consider the repurchase, and Haworth was provided the calculations that Humphreys prepared of the financial impact to Safety-Kleen of the repurchase. Thus, Bullock and Haworth were privy to both sides of the negotiations.

130.    On April 19, 1999, Safety-Kleen issued a press release announcing that it "intends to offer up to $225 million of senior notes due 2009 ..." On the same day, the Company announced its agreement to repurchase its outstanding $350 million PIK Debenture from Laidlaw

-51-

for $200 million in cash and 11,320,755 shares of Safety-Kleen common stock. The Company stated that the funds generated from the $225 million offering ("the 1999 Offering") of the 2009 Bonds would fund the cash portion of the purchase of the PIK Debenture.

131.    The 2009 Bonds were issued via a two-step process, whereby the bonds were issued to investors as unregistered bonds pursuant to an Offering Memorandum, and were subsequently exchanged for registered but otherwise identical bonds. The bonds were priced from the outset as registered, fully tradeable securities.

132.    The Offering Memorandum for the 2009 Bonds (the "1999 Offering Memorandum") was created by Safety-Kleen, the Individual Defendants, and TD Securities, and was disseminated to investors in the spring of 1999. TD Securities was a lead underwriter and initial purchaser for the 2009 Bonds. As such, TD Securities initially purchased the 2009 Bonds from the issuer with a view toward immediately reselling them to investors like Plaintiff. TD Securities was compensated for its services by a discount between the price at which it initially purchased the 2009 Bonds from the issuer and the offering price. This difference of 2.5% (*i.e.*, TD Securities' fee) was the industry standard for underwriters of public offerings.

133.    The 1999 Offering Memorandum was used by Safety-Kleen, the Individual Defendants and TD Securities to solicit investors to purchase the 2009 Bonds in the first step of the offering, as well as to participate in the second step exchange by which the 2009 Bonds achieved their status as registered, freely tradeable securities. The two steps of the offering were inseparable, and each and every communication soliciting the participation of any person in the first step necessarily also solicited participation in the second step.

-52-

134.    Defendant PwC reviewed the 1999 Offering Memorandum prior to its issuance and provided "comfort letters" to TD Securities with respect to the financial information contained therein. With PwC's consent, its audit opinion on the Company's fiscal 1997 and fiscal 1998 financial statements was included in the 1999 Offering Memorandum.

135.    The proceeds of the sale of the 2009 Bonds were not being used for operating purposes but rather to repurchase the PIK Debenture. As a result, the 1999 Offering Memorandum highlighted the success of Safety-Kleen in order to induce purchasers of the 2009 Bonds to make an investment in the Company that was to immediately leave the Company.

136.    The 1999 Offering Memorandum described the Company as a "vertically integrated hazardous and industrial waste management company" whose "breadth and quality of ... service offerings, combined with the geographic scope of [its] facilities, have provided [it] with a leading market position in [the] industry."

137.    The 1999 Offering Memorandum further explained the Company's business strategy and competitive strengths as follows:

### Business Strategy

Our strategy is to continue to vertically integrate our operations and enhance our profitability by further rationalizing operations, internalizing waste streams and expanding the services we provide to our customer base. Key elements of our strategy include:

- completing our costs savings program relating to the acquisition of Old Safety-Kleen;

- evaluating additional acquisitions that may complement our existing service network and infrastructure;

-53-

- increasing waste internalization rates;

- increasing revenues by cross selling the combined Company's services to our expanded customer base; and

- expanding the number of services we offer our customers by leveraging our expertise and customer relationships to provide cost effective and comprehensive solutions for all of their environmental needs.

### Competitive Strengths

*Low-cost service provider.* With over-expansion in the hazardous and industrial waste industry during the 1980s and the early 1990s, it has become critical for successful waste management companies to maintain high capacity utilization of a well-managed fixed asset base. We have created a cost structure which we believe is the lowest in the industry.

*Vertically integrated approach.* From collection through treatment and disposal, we deliver a closed-loop solution for any type of waste stream. We believe that we offer a broader array of services from more locations than any other waste services provider. Accordingly, we believe we can provide our customers with a single source for their hazardous and industrial waste needs while decreasing costs by maintaining a high rate of waste stream internalization. . . .

138.    The 1999 Offering Memorandum also explained that the Company had sufficient

liquidity and capital resources:

*Working Capital.* Total cash provided by operations during the six months ended February 28, 1999 was $81.7 million. This was comprised of $143.3 million from operations before financing working capital requirements of $13.8 million and $48.8 million related to spending on acquisition liabilities. The cash provided by continuing operations during fiscal 1998, 1997 and 1996 was $87.6 million, $37.0 million and $21.9 million, respectively. In fiscal 1998, cash from operations was comprised of $192.0 million from

-54-

operations before financing working capital requirements of $47.1 million and $57.3 million related to spending on acquisition liabilities.

\* \* \*

We believe that our existing level of working capital is adequate for normal growth and operating needs. Trade and other accounts receivable continue to represent the largest portion of current assets, totaling $320.0 million at August 31, 1998. The average days sales outstanding was reduced to 66 days, from 93 days at August 31, 1997 primarily as a result of the lower average days outstanding of the Old Safety-Kleen operations. Our primary sources of liquidity are cash flows from operations, existing cash and short-term investments of $10.9 million as of February 28, 1999, and available borrowings under bank lines and the Revolver of the Senior Credit Facility.

*Capital Expenditures and Capital Resources.* Investing activities for the six months ended February 28, 1999, generated cash of $105.1 million. Investing activities from continuing operations used cash of $1,293.3 million, $21.9 million and $114.9 million in fiscal years 1998, 1997 and 1996, respectively. In fiscal 1998, $1,281.5 million was incurred in connection with the acquisition of Old Safety-Kleen. Net expenditures for the purchase of fixed assets for normal replacement requirements and increases in services were $29.7 million and net proceeds from the recapitalization of the European operations were $138.7 million during the six months ended February 28, 1999. Net expenditures for the purchase of fixed assets for normal placement requirements and increases in services were $50.8 million, $36.1 million and $104.3 million in fiscal 1998, 1997 and 1996, respectively. Our projected capital expenditures for fiscal 1999 are approximately $80.0 million.

Upon repurchase of the PIK Debenture, we (together with our subsidiaries) will have an aggregate of $2.0 billion of indebtedness outstanding, including $1.3 billion under the Senior Credit Facility. During the balance of fiscal 1999, scheduled principal payments on our indebtedness will total $39.0 million. As of February 28, 1999, there was $340 million of borrowing availability under the Revolver of the Senior Credit Facility. The Senior Credit Facility contains customary negative, affirmative, and

financial covenants, including covenants limiting annual capital expenditures, restricting debt, guaranties, liens, mergers and consolidations, sales of assets and payment of dividends. . . .

We believe that our existing working capital (consisting of cash and short-term investments), together with borrowings under the Senior Credit Facility, and anticipated cash flow from operating activities will be sufficient to meet our debt service and expected operating and capital spending requirements and environmental liability requirements for the next twelve months. To the extent that any additional capital is required for any purpose (including potential acquisitions), we believe that we will be able to raise such capital in the public or private debt or equity markets.

139.    The 1999 Offering Memorandum provided historical and selected consolidated

financial data for the Company and its subsidiaries, including: revenues of $652,973,000,

$678,619,000 and $1,185,473,000 for fiscal years ended August 31, 1996, August 31, 1997 and

August 31, 1998, respectively; basic earnings (loss) per share of $0.07, ($1.33) and $0.00,

respectively for those fiscal years; EBITDA of $105,610,000, $120,489,000, and $279,274,000,

respectively for those fiscal years; and EBITDA of $437,863,000 for the twelve-month period

ended February 28, 1999. These financial results were derived from the Company's consolidated

financial statements as audited and/or reviewed by PwC.

140.    The 1999 Offering Memorandum presented *pro forma* EBITDA figures for the

Company of $393,990,000 and $451,152,000, respectively, for the fiscal year ended August 31,

1998, and the twelve-month period ended February 28, 1999, giving effect to the Safety-Kleen

Acquisition and related transactions as if they occurred on September 1, 1997.

141.    According to the 1999 Offering Memorandum, "EBITDA represents operating

income plus (i) depreciation and amortization and (ii) for fiscal 1998 and the twelve months ended

February 28, 1999, the $65.8 million non-recurring restructuring charge incurred in connection

-56-

with the acquisition of Old Safety-Kleen." The Offering Memorandum stated that "EBITDA is presented because it provides useful information regarding [Safety-Kleen's] ability to service debt." Defendants understood that the ability to service debt was of critical importance to prospective purchasers of debt securities such as the Bonds.

142.    The historical and *pro forma* EBITDA figures in the 1999 Offering Memorandum were materially false and misleading because the Defendants knew or should have known facts (including facts relating to the Company's accounting practices) which rendered the components of the EBITDA calculation, including income, depreciation and amortization, inaccurate.

143.    The first page of the 1999 Offering Memorandum highlighted the substantial cost savings purportedly achieved by the Company by virtue of the Safety-Kleen Acquisition, and the resulting Adjusted EBITDA estimates of $485.2 million which could be used for debt service for the Bonds:

> We currently expect to realize approximately $165 million of annual cash cost savings as a result of this acquisition. As of February 28, 1999, we believe we have realized approximately $130 million in annualized cash cost savings through the closure of redundant facilities, personnel reductions, the elimination of duplicative administrative costs and the internalization of waste disposal activities.

Based, in part, on these cost savings, Safety-Kleen reported: "For the twelve months ended February 28, 1999, our pro forma revenues and Adjusted EBITDA (as defined) were $1.8 billion and $485.2 million, respectively." All of these statements were materially false and misleading, because the Company had not realized $130 million in annualized cost savings as a result of the Safety-Kleen Acquisition, and because the Defendants knew or should have known other facts

-57-

(including facts relating to the Company's accounting practices) which rendered their projections as to future cost savings, *pro forma* revenues and Adjusted EBITDA inaccurate.

144.    The 1999 Offering Memorandum disclosed that, under the Senior Credit Facility, the Company was "required to obtain interest rate protection satisfactory to [an affiliate of TD Securities] in respect of at least 40% of its floating rate debt for a period of at least two years." The 1999 Offering Memorandum also stated that "[t]he Company uses interest rate swap agreements to minimize the impact of interest rate fluctuations on floating interest rate long-term borrowings," and that "[t]he differential paid or received on interest rate swap agreements is recognized as an adjustment to interest expense." These representations were materially false and misleading, because the Company's interest rate swap agreements were actually increasing, rather than reducing, the impact of interest rate fluctuations on the Company, and because the premiums the Company had been receiving on these derivative contracts were being recorded as revenue rather than as adjustments to interest expense.

145.    CGTC purchased 2009 Bonds in the initial offering on behalf of Plaintiff, after reading (and in reliance upon) the Company's 1998 10-K, the 1999 Offering Memorandum, and other public filings, including the false financial statements that would later be withdrawn and restated.

## SAFETY-KLEEN CONTINUES TO PUT OUT FALSE INFORMATION

146.    On May 27, 1999, Safety-Kleen filed a Form 8-K with the SEC, containing unaudited pro forma combined financial information for the year ended August 31, 1998, giving effect to the Safety-Kleen Acquisition as if it had occurred on September 1, 1997. In addition to reiterating historical financial results of LES from the 1998 10-K which were materially false, the

Form 8-K falsely stated that the Safety-Kleen Acquisition had been accounted for "using the purchase method of accounting applied in accordance with generally accepted accounting principles," and that "the assets and liabilities of Old Safety-Kleen [had] been recorded at their estimated fair value, with any difference between the amount of such fair value and the purchase price being recorded as goodwill."

147.    On July 6, 1999, Safety-Kleen issued a press release announcing its results for the third quarter of fiscal 1999, the period ending May 31, 1999. According to the press release, for the third quarter of 1999, the Company reported revenues of $400.9 million and net income of $29.7 million, as compared to revenues of $365 million for the same period the prior year.

148.    On July 12, 1999, Safety-Kleen filed a Form S-4 Registration Statement relating to the 2009 Bonds with the SEC. The Form S-4 contained substantially similar information to the 1999 Offering Memorandum, including financial data for the fiscal year ended August 31, 1998 and the period ended February 28, 1999. The Form S-4 Registration Statement was signed by Bullock, Haworth, Humphreys,Winger, Tippie, and Wareham. In the Form S-4, Bullock, Haworth, Winger, Tippie, and Wareham also appointed Humphreys as their attorney-in-fact and agent to sign all amendments to the Form S-4 on their behalf. It also included PwC's unqualified audit opinion covering the fiscal 1997 and fiscal 1998 financial statements.

149.    On or about July 15, 1999, the Company filed a Form 10-Q with the SEC for the third quarter of 1999, the period ending May 31, 1999, which was signed by Defendants Winger and Humphreys and contained the financial results announced on July 6, 1999. In addition to the foregoing, the Form 10-Q also contained, among other things, the following materially false and misleading statement:

> The accompanying interim consolidated financial statements have
> been prepared in accordance with the instructions to Form 10-Q and
> Rule 10-01 of Regulation S-X. . . . In the opinion of management,
> all adjustments considered necessary for a fair presentation of the
> interim period results have been included; all such adjustments are
> of a normal recurring nature.

150.    On August 10, 1999, Safety-Kleen filed with the SEC an amended registration

statement for the 2009 Bonds on Form S-4/A (the "1999 Registration Statement"). The 1999

Registration Statement was signed by Humphreys on behalf of himself and as attorney-in-fact for

Bullock, Haworth, Winger, Tippie, and Wareham. In language similar to that in the 1999

Offering Memorandum, the 1999 Registration Statement described the Company, its business

strategy and competitive strengths, and explained that the Company had sufficient liquidity and

capital resources. The Company repeated its representations contained in the 1999 Offering

Memorandum that its "existing level of working capital is adequate for normal growth and

operating needs" and that "existing working capital (consisting of cash and short-term

investments), together with borrowings under the Senior Credit Facility, and anticipated cash flow

from operating activity will be sufficient to meet [the Company's] debt service and expected

operating and capital spending requirements and environmental liability requirements for the next

twelve months." These statements were materially false and misleading because the Company's

actual levels of working capital (which were concealed from investors) were insufficient to meet

the Company's requirements.

151.    The 1999 Registration Statement contained the same misrepresentations regarding

Safety-Kleen's financial results for the year ended August 31, 1998 as did the 1999 Offering

Memorandum. The 1999 Registration Statement incorporated by reference the 1998 Form 10-K,

and also reported financial results of Safety-Kleen for the nine-month period ended May 31, 1999, including revenue of $1,270,089,000, net income of $75,711,000, net income per share of $0.86, and EBITDA of $358,398,000. It also included PwC's unqualified audit opinion covering the fiscal 1997 and fiscal 1998 financial statements, and PwC's consent, dated August 9, 1999, to the inclusion of its audit opinion in the 1999 Registration Statement. The audit opinion, financial statements, and other financial data in the 1999 Registration Statement were materially false and misleading as a result of the improper accounting practices alleged herein.

152.    The 1999 Registration Statement became effective on August 10, 1999, and on or before September 27, 1999 Plaintiffs exchanged their unregistered 2009 Bonds (CUSIP # 78648RAA2) for registered 2009 Bonds (CUSIP # 78648RAB0).

## LAIDLAW TRIES TO TAKE THE MONEY AND RUN BEFORE THE TRUTH CAN BE DISCOVERED

153.    On August 27, 1999, Safety-Kleen announced that it had completed its repurchase of the PIK Debenture from Laidlaw for approximately 11.3 million Safety-Kleen common shares and $200 million in cash. The transaction resulted in Laidlaw beneficially owning 43.8 million common shares of Safety-Kleen, or 43.6% of Safety-Kleen stock.

154.    On September 13, 1999, Safety-Kleen announced in a press release that it had been informed that Laidlaw planned to actively seek a buyer for its interest in the Company and to complete this divestiture over the course of the next six to twelve months. Safety-Kleen also announced on September 13, 1999, that the Board had appointed a Special Committee made up of non-Laidlaw directors to consider the implications of the announced change in Laidlaw's time horizon for divesting its 44% common share ownership of the Company.

-61-

155. On October 5, 1999, Safety-Kleen issued a press release announcing its results for the fourth quarter and fiscal year ended August 31, 1999. That press release was filed with the SEC as an attachment to a Form 8-K filed by Safety-Kleen, and signed by Winger, on October 6, 1999. According to the press release, for the fourth quarter of 1999, the Company reported revenues of $415.9 million and net income of $28.2 million, or $0.28 per share, as compared to revenues of $435 million and earnings per share of $0.22, for the same period the prior year. For the twelve months ended August 31, 1999, reported revenues totaled $1,685.9 million, an increase of 42.2% over $1,185.5 million reported in the prior year. Defendant Winger commented on the results in pertinent part as follows:

> The aggressive goals that we set for the Company in fiscal 1999 were met. Dramatic cost savings were achieved. The integration of our revenue generating services, our staff and our business procedures have been largely completed. We have continued to build upon the positive aspects of last year's merger. The result is the most efficient and focused company in the industrial marketplace today. We are now beginning to see the growth that Safety-Kleen can produce. Specifically, we are encouraged by growth of more than 5% from the core components of our current business. Our leading position and continued commitment to providing effective solutions to customer needs will provide for continued progress in fiscal 2000.

156. On October 12, 1999, Safety-Kleen announced that it had received a detailed report from its Special Committee on strategic and financial alternatives for the Company. The Special Committee recommended, and the Board unanimously agreed, that the Board "begin discussions with likely sale or merger candidates." Defendant Winger noted that the Special Committee had "initially concluded that a sale or merger of Safety-Kleen will probably result in the best value for all shareholders at this time...."

-62-

157.    On October 29, 1999, Safety-Kleen filed with the SEC its Form 10-K for fiscal year 1999 ended August 31, 1999 (the "1999 10-K"), which was signed by Defendants Bullock, Haworth, Winger, Humphreys, Tippie, and Wareham.  The 1999 10-K contained the financial results previously announced in the October 5, 1999 press release and contained financial statements audited by PwC.

158.    The 1999 10-K specifically touted the cost savings that had already been achieved through the Safety-Kleen Acquisition:  "The Company estimates that the vast majority of available cost reduction measures associated with the acquisition of Old Safety-Kleen has been achieved by the fourth quarter of fiscal 1999."

159.    In addition to containing false financial data, the 1999 10-K contained the following false or misleading statements regarding the Company's accounting practices, among others:

(a)    "All significant intercompany balances and transactions have been eliminated in consolidation;"

(b)    "The Company accrues for estimated closure and post-closure costs over the life of the landfill site as capacity is consumed.  In accordance with American Institute of Certified Public Accountants Statement of Position 96-1 ("SOP 96-1"), the Company accrues for costs associated with environmental remediation obligations on a site basis when such costs are probable and reasonably estimable;" and

(c)    "Depreciation and amortization of . . . property, plant and equipment is provided substantially on a straight-line basis over the estimated useful lives. . . ."

160.   PwC's "Report of Independent Accountants" was included, with PwC's consent, in

the 1999 10-K. That report stated in pertinent part:

> In our opinion, the accompanying consolidated balance sheets and
> the related consolidated statements of income, comprehensive
> income, cash flows and stockholders' equity present fairly, in all
> material respects, the financial position of Safety-Kleen Corp. and
> its subsidiaries at August 31, 1999 and 1998, and the results of their
> operations and their cash flows for each of the three years in the
> period ended August 31, 1999, in conformity with generally
> accepted accounting principles. . . . We conducted our audits of
> these statements in accordance with generally accepted auditing
> standards, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. . . . We believe that our audits
> provide a reasonable basis for the opinion expressed above.

161.   On January 4, 2000, Safety-Kleen issued a press release announcing its operating

results for the first quarter of fiscal 2000, the period ending November 30, 1999. That press

release was filed with the SEC as an attachment to a Form 8-K filed by Safety-Kleen, and signed

by Humphreys and Winger, on January 7, 2000. According to the press release, for the first

quarter of fiscal 2000, the Company reported revenues of $408.5 million, operating income of

$83.1 million, net income of $24.7 million, or $0.25 per share, and operating margins of 20.3%

(up from 19.3% in the same quarter in fiscal year 1999). The Company's EBITDA totaled

$116.8 million, and its EBITDA margins rose to 28.6% from 27.3% in the prior year.

162.   On or about January 14, 2000, the Company filed a Form 10-Q with the SEC for

the first quarter of fiscal 2000, the period ending November 30, 1999, which was signed by

Defendants Winger and Humphreys and contained the financial results previously announced on

January 4, 2000. The Form 10-Q also contained, among other things, the following materially

false and misleading statement:

-64-

> The accompanying interim consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. . . . In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included; all such adjustments are of a normal recurring nature.

163.    On January 24, 2000, Edward A. Siegel ("Siegel") of TD Securities placed a

"BUY" recommendation on the Bonds, as reported in TD's High Yield Research Update. That

Update provided:

> We see limited downside in these bonds as the fundamental business is sound.  We expect operating results will improve over the next several quarters, providing the impetus for spread tightening to the 325 and 385 basis point range for the 2008's and 2009's, respectively. . . . We find SK bonds attractive versus comparable issues.
>
> * * *
>
> The Company has ample liquidity to meet its operating and capital requirements at the end of the first quarter, the company had $198 million available on its revolver and was in compliance with all of its covenants under its credit agreement. [emphasis added]

Siegel also forecasted "better times ahead" for the Company, stating:

> SK has all of the components to generate above-market growth and returns. . . .  At current run rates the company has the ability to generate approximately $200 million of free cash flow, which would be available for debt reduction. . . . We forecast fiscal year 2000 EBITDA of $474 million compared with management's $475-$515 million.  Our estimate would cover interest expense 2.9x. Furthermore, we expect that the company will generate $100 million of free cash flow this year leaving debt at approximately $1.95 billion and leverage at 4.1x.  That represents a significant improvement over first quarter's leverage of 4.4x.

## THE TRUTH BEGINS TO EMERGE - HEADS BEGIN TO ROLL

164.    On January 25, 2000, the Company announced that Bullock had resigned as

Director and Chairman of the Board "in compliance with a requirement of Laidlaw." The

Company did not provide any explanation for Bullock's resignation.

165.    On February 8, 2000, the Company held a Board meeting.  The materials that were

distributed in connection with that meeting indicated that certain non-cash accounting adjustments

had been made to the Company's accounts and financial statements for the first quarter of fiscal

year 2000.  These adjustments were significant, because they masked the fact that actual financial

results from that quarter fell fall short of expectations.  Director David Thomas ("Thomas") was

particularly concerned about these adjustments, and intended to ask questions about them during

the meeting.  However, the entire meeting was consumed with discussions regarding who would

replace Bullock as Chairman, and Thomas did not have an opportunity to raise the issue.

166.    On February 9, 2000, the Company announced in a press release that its Board had

appointed Peter Widdrington as a Director and Chairman of the Board "to fill the unexpired term

created by a recent resignation."  Widdrington was then serving as Chairman and a Director of

Laidlaw.  The Company also announced that it had formed a three member Executive Committee

of the Board consisting of David Thomas as Chairman and Widdrington and Winger as additional

members.

167.    On February 10, 2000, the Company announced that it had:

-66-

disbanded the Special Committee of the Board of Directors formed September 13, 1999 for the purpose of considering the implications of the announced change in Laidlaw, Inc.'s time horizon for divesting its 44% common share ownership of the Company. The Special Committee noted that following its review of the alternatives available to Safety-Kleen in light of discussions with potential buyers and given its recent operating performance and stock price the Company has determined that further action regarding a potential sale of the Company is unwarranted at this time.

168.    The Safety-Kleen Board of Directors held another board meeting on February 18, 2000. During that meeting, Thomas got the opportunity to ask questions about the non-cash adjustments from the first quarter. He asked Humphreys whether non-cash adjustments had been made in prior periods, and Humphreys responded that no material non-cash adjustments had been made prior to the first quarter of fiscal year 2000. This was not true.

169.    On February 24, 2000, the Company's General Counsel, Henry Taylor ("Taylor") – who had attended the February 18 meeting and recognized Humphreys' answer as a misrepresentation – telephoned Thomas and informed him that a member of the Company's accounting department had come to him with information indicating that the Company's financial statements were being manipulated so as to inflate its reported earnings. Later that day, Thomas spoke with that individual, William Ridings (the Company's controller), who confirmed that the Company was engaged in accounting fraud.

170.    Ridings explained to Thomas that, during the middle of the third month of each quarter, Humphreys would inform the financial management team of the numbers he wanted to report, and would identify the areas where the entries would take place. Ridings and others in the accounting group would then make those entries and Humphreys would approve them. Years

-67-

later, Ridings gave a similar account of the fraud when he pleaded guilty to, *inter alia*, charges of securities fraud and conspiracy to commit securities fraud in connection with the misstatement of the Company's financial statements for fiscal 1997-1999. As part of his guilty plea, Ridings described his misconduct as follows:

> Beginning in approximately August 1998 and continuing until approximately March 2000, I participated with Paul Humphreys, Thomas Ritter and others in a scheme to make false and misleading entries in the financial books and records of Safety-Kleen. In particular, we created financial records to give the false appearance that the company was generating far higher earnings before interest, taxes, depreciation and amortization, EBITDA, than was in fact the case....

171.    On February 26, 2000, Safety-Kleen retained the law firm of Shaw Pittman to investigate possible accounting irregularities in connection with the Company's prior-period financial statements. On February 28, 2000, Shaw Pittman retained Arthur Anderson LLP ("Arthur Andersen") to assist in that investigation.

172.    Thomas called a special meeting of the Board for March 4, 2000, and invited Humphreys, Winger, Bragagnolo, all of the directors, Shaw Pittman, and Arthur Anderson to attend. The primary purpose of the meeting was to inform the Board of the allegations of accounting improprieties. Thomas also requested Board approval to place Winger, Humphreys and Bragagnolo on administrative leave, to conduct an internal investigation, and to publicly disclose these actions. Upon learning of the subject of the meeting, the Laidlaw directors (at that time Peter Widdrington and Haworth) objected to the meeting going forward, and demanded to consult legal counsel. Ultimately, Thomas persuaded Widdrington to allow the meeting to proceed.

-68-

173.    During the March 4, 2000 special meeting, which carried over into March 5, 2000, Thomas provided the full Board with a detailed description of what he had been told by Ridings. The presentation also included a summary by Thomas and Grover Wrenn of what they were told by Ridings and Thomas Ritter, another former employee in the Company's accounting group, on the evening of March 4, 2000. During that meeting, Ritter admitted that he had been instructed by Humphreys to make accounting adjustments which Ritter believed to be wrong, but when he had expressed discomfort to Humphreys about those adjustments, Winger and Humphreys had bought his silence with an agreement for two years' salary and benefits.

174.    During the March 4-5, 2000 Board meeting, Thomas and Wrenn explained that their preliminary investigation indicated that the Company's management had been regularly making bogus quarter-end and year-end adjustments for the purpose of boosting earnings by significant amounts, and that the Company's earnings for the first quarter of fiscal 2000 were overstated by 50%. They also stated that they had been informed of suspiciously large amounts of documents being shredded by members of senior management during early 2000.

175.    In response to the presentations at the special meeting, Winger denied the allegations, and Humphreys and Bragagnolo remained silent. Haworth reacted very defensively and aggressively, accusing Thomas and Wrenn of not knowing anything about accounting. Haworth came to the defense of Humphreys and Winger, and defended accounting positions which appeared to Thomas and other directors to be indefensible, including the Company's accounting for derivatives and its capitalization of fuel and tire costs. Haworth admitted that Laidlaw, where he was CFO, had engaged in some of the very same accounting practices as the ones being questioned at Safety-Kleen (including derivatives accounting and capitalization of fuel

-69-

and tires). Haworth took the position that there was nothing wrong with preliminary runs of financial statements, and admitted that he sometimes received as many as 18 in a single accounting period. Haworth's reaction to the allegations led Thomas and other directors to believe that Haworth was aware of and trying to defend the Company's improper accounting.

176.    At the end of the March 5, 2000 meeting, the Board voted to put Winger, Humphreys, and Bragagnolo on administrative leave. The Board also formed a Special Committee consisting of Thomas, Tippie, Grover Wrenn, and Robert Luba, to commence an investigation into the reports of accounting irregularities, and approved making a public disclosure of the fact that allegations of accounting improprieties had been made, and that an investigation had commenced. These actions were not unanimous. Two Laidlaw appointees to the Board -- Haworth and Widdrington – voted against making public disclosure of the allegations. In addition, Haworth, Widdrington and Luba voted against placing the Company's executives on administrative leave.

177.    On March 6, 2000, Safety-Kleen announced in a press release that it had "initiated an internal investigation of its prior reported financial results and certain of its accounting policies and practices following receipt by the Company's Board of Directors of information alleging possible accounting irregularities that may have affected the previously reported financial results of the Company since fiscal year 1998." The press release stated:

> The Board has appointed a special committee, consisting solely of four independent outside directors of the Company, to spearhead the internal investigation, and has engaged Shaw Pittman and Arthur Andersen LLP to conduct a thorough and comprehensive investigation of these matters.

In the press release, Thomas promised that, if the allegations were true, the Company would "take all appropriate actions to correct previously issued financial statements, reports or documents that contain erroneous financial information."

178.    The press release further stated that Defendants Winger, Bragagnolo and Humphreys had been placed on "administrative leave" pending the results of the "investigation," and that the Board had elected Grover Wrenn as Vice Chairman of the Board to oversee the management of the Company on an interim basis.

179.    The Company took these drastic steps because it was clear that the so-called "accounting irregularities" were material and would lead to a significant financial restatement in the future.

180.    On March 7, 2000, PwC orally advised the Company that PwC was withdrawing its previously issued audit reports on the Company's financial statements for the years ended August 31, 1999, 1998 and 1997. PwC's withdrawal of its reports was disclosed to the public on March 9, 2000, when Safety-Kleen filed a Form 8-K with the SEC, to which was attached a letter dated March 8, 2000 from PwC to Grover Wrenn. In that letter, PwC stated that its prior reports "should no longer be relied upon or associated with the financial statements of Safety-Kleen. . . ."

181.    On March 10, 2000, Moody's Investors Services downgraded the Bonds and assigned a "negative outlook" for the Company. Approximately $2.4 billion of the Company's debt was affected.

182.    On March 13, 2000, Standard & Poor's lowered its ratings on Safety-Kleen, and put all ratings of the Company on "CreditWatch, with negative implications." As noted in a CreditWise press release by Standard & Poors:

The downgrades reflect increased uncertainties about the firm's true financial performance in recent years following the withdrawal of its financial statements by Price WaterhouseCoopers LLP, Safety Kleen's auditors, in the wake of an investigation into alleged accounting irregularities at the Company. . . . The rating action is also based on heightened concerns about Safety-Kleen's sufficient liquidity stemming in part from a potential lack of covenants compliance with its lending group and the resulting credit availability.

183.    On March 13, 2000, the Company again admitted that its previously reported financial results contained certain undefined accounting irregularities.  The Company announced in a press release that it was "continuing the previously announced internal investigation of its prior reported financial results and certain of its accounting policies and practices" and that "[p]reliminary results of such investigation indicate that there have been accounting irregularities that affected the previously reported financial results of the Company since fiscal year 1998."

184.    The Company also stated in its March 13, 2000 press release that:

The Company's interim management has determined that the Company's cash position and cash generated from operations will not be sufficient to fund its current operations without engaging in short-term borrowings or selected asset dispositions.  The Company is in default under certain financial covenants contained in its credit agreements and is not able to borrow under those agreements without a waiver of such defaults by the lenders.  The Company is currently engaged in negotiations with the lenders and will not be in a position to comment further on such negotiations pending their resolution.

The Company has been advised by the staff of the Securities and Exchange Commission that a formal investigation of the Company has been initiated.  The Company has advised the Securities and Exchange Commission that it intends to cooperate fully in the investigation.

185.    On March 16, 2000, the Company issued a press release reporting its determination "that there have been accounting irregularities in several areas, including inappropriate recognition of gain on derivatives transactions, improper revenue recognition, inappropriate capitalization of costs, and insufficient liability accruals."

186.    Market reaction to these announcements was immediate as the value of the Bonds plummeted and liquidity dried up.   Having never traded below 85% of par prior to March 6, 2000, the 2009 Bonds plummeted to 3% of par by March 15, 2000.

187.    On May 12, 2000, the Company announced in a press release the resignation of Winger as President and CEO, Bragagnolo as COO, and Humphreys as CFO.  It was subsequently reported in Safety-Kleen's Form 10-K filing for the fiscal year ended August 31, 2000, that the Company had "terminated the employment of Messrs. Winger, Bragagnolo, and Humphreys in July 2000."

188.    On June 6, 2000, Safety-Kleen announced in a press release that it had failed to make the required interest and principal payments due on certain outstanding debt the prior week. The Company stated that it:

> did not make an interest payment of $1.8 million related to a $60 million Promissory Note dated May 15, 1997.  Additionally, the Company did not make a $15 million interest payment on its 9 1/4 percent Senior Notes due 2008; and it did not make a $43 million principal and interest payment under its Senior Credit Facility dated April 3, 1998.

189.    On June 9, 2000, the Company filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.

190. Also on June 9, 2000, the Board accepted the resignation of Winger from his position as a director of the Company.

191. On August 8, 2000, the Company filed a Form 8-K with the SEC, stating that the Company had dismissed PwC as its independent accountants on August 1, 2000, and retained Arthur Andersen as successor independent accountants. The Bankruptcy Court later approved the Company's retention of Arthur Anderson for that purpose.

192. PwC was dismissed based upon the recommendation of the Special Committee and the Audit Committee. Prior to its dismissal, PwC had refused to cooperate in the Special Committee's investigation, denying the Committee and its advisors access to PwC personnel and workpapers.

193. On November 29, 2000, the Company filed its Form 10-K for the fiscal year ended August 31, 2000 (the "2000 10-K") with the SEC. The 2000 10-K stated that the Special Committee was continuing its investigation regarding the Company's prior reported financial results and accounting policies and practices. The 2000 10-K did not contain financial statements, but stated that:

> Upon completion of the audit by Arthur Andersen for fiscal years ended August 31, 1997 through August 31, 2000, the Company will amend this Form 10-K, [and] file audited restated financial statements for those four fiscal years, as applicable ...

## THE RESTATEMENT AND THE RESULTS OF THE INTERNAL INVESTIGATION

194. On July 9, 2001, Safety-Kleen issued the Restatement in the form of a Form 10-K/A which amended its 2000 10-K. The Restatement included restated financial statements for each of the fiscal years ended August 31, 1997, August 31, 1998, and August 31, 1999, and

also contained financial statements for the fiscal year ended August 31, 2000. The Restatement

was approved by Company's Board, including Tippie and Wareham.

195.    In the Restatement, the Company reported that it had discovered material

weaknesses in its internal controls:

> The new management team has identified numerous critical issues
> which will require resolution prior to the Company's emergence
> from its reorganization proceedings. In addition to these efforts,
> and as part of the restatement process, the Company identified
> material deficiencies in many of its financial systems, processes and
> related internal controls and commenced efforts to correct these
> conditions. During October 2000, Arthur Andersen LLP reported to
> the Audit Committee of the Board of Directors that the Company
> had material weaknesses in its internal controls and that these
> conditions would be considered in determining the nature, timing
> and extent of their audit tests for fiscal years 1997 through 2000.

196.    The Restatement described the process leading up to the issuance of restated

financial statements, in pertinent part, as follows:

> ... The Company conducted a comprehensive internal review of its
> accounting records for fiscal 1997 to 2000 and engaged Arthur
> Andersen LLP as its new independent public accountants to, among
> other things, conduct an audit of the Company's consolidated
> financial statements for the same periods...
>
> This review and investigation resulted in restatements to fiscal 1997
> through 1999 which reduced by approximately $567 million the
> Company's consolidated stockholders' equity as of August 31, 1999
> as previously reported in the Consolidated Financial Statements. In
> addition, significant adjustments to the accounting records related to
> fiscal year 2000 were made. The Company has expended
> substantial resources in connection with the restatement efforts and
> has (i) conducted a comprehensive internal accounting review and
> determined the nature, amount, and applicable fiscal year of the
> resulting adjustments, (ii) prepared the Consolidated Financial
> Statements and all related disclosures and information required for
> this Form 10-K/A and (iii) assisted its new independent auditors
> with their audits so that they could report on these periods. While

-75-

the investigations have not yet been completed, current management believes it has considered all relevant facts and circumstances in connection with the preparation of its fiscal 1997 through 2000 financial statements and believes that further material adjustments are unlikely.

197.    The total effect of the Restatement was to reduce the Company's net income by $1.3 billion, of which the Company was able to attribute approximately $533.6 million to specific years (fiscal 1997 through fiscal 1999). The cumulative after-tax effect of the Restatements on the periods prior to fiscal 1997 was $54.6 million, which was reflected as a charge to retained earnings as of September 1, 1996.

198.    The Restatement, which is incorporated herein by reference, contains a breakdown of the Restatement adjustments, by year, into each of the following primary categories: purchase accounting related items; landfill accounting and environmental liabilities; harbor dredging operations; derivative transactions; capitalized costs; revenue recognition; restructuring and other charges; additional asset adjustments; and additional liability adjustments.

199.    For fiscal 1997, the Restatement increased the Company's previously reported net loss of $183,432,000 by $118,112,000 (or 64%) , for a restated net loss of $301,544,000. The Company also reported a restated operating loss of $295 million, and restated negative net cash flow from operating activities of $6.4 million. For fiscal 1998, the Restatement converted previously reported net income of $205,000 into a net loss of $103,211,000. The Company also reported a restated operating loss of $2.2 million and restated negative net cash flow from operating activities of $135 million for that year. For fiscal 1999, the Company's originally-reported net income of $88,876,000 was reduced by $312,031,000, for a restated net loss of

$223,155,000, and the Company reported restated operating income of $6.9 million and restated net cash flow from operating activities of $18.5 million.

200.    Safety-Kleen director Grover Wrenn, who participated in the internal investigation into the accounting irregularities, has stated under oath: "[A]ggressiveness is not the appropriate term for the accounting that was being done [prior to the Restatement]. Fraud is the appropriate term for the accounting that was being done."

201.    During the internal investigation, the Special Committee determined that Laidlaw had applied extreme pressure on Winger and Humphreys to meet earnings expectations at all costs, and that Humphreys' actions in relation to the accounting irregularities were in response to the expectations placed on him by Winger, Haworth, and Bullock.

202.    One example of the pressure Bullock applied to Humphreys is what is referred to as the "three cents" issue. Prior to a July 1999 Board meeting, Bullock received the Company's preliminary third quarter fiscal 1999 financial results, and saw that they were below expectations. Bullock telephoned Winger and suggested that certain incinerator shut-down costs be shifted from the third quarter to the fourth quarter. This was a departure from the treatment of incinerator shut-downs in prior years, when no costs were shifted. Nevertheless, the change was made, and the third quarter earnings per share increased by three cents.

203.    Immediately following the March 4, 2000 Board meeting, Thomas confronted Humphreys and asked him whether he had been pressured by someone to manipulate the numbers. Humphreys responded by asking Thomas if he remembered the three cents issue, and saying "That's what you are looking for." Subsequently, when Thomas again inquired about the motivations behind the fraud, Humphreys replied: "Dave, I'll tell you the same thing I told you at

-77-

the March 4th-5th board meeting. Look to the three cents and you'll understand who was putting

the pressure on me." Bullock and Haworth, acting on behalf of Laidlaw, were the primary source

of that pressure.

204.    Laidlaw, Bullock, Haworth, Winger, Humphreys, Bragagnolo, and PwC all refused

to cooperate in the internal investigation. Even worse, Haworth took actions to compromise the

investigation when, upon being given an opportunity to review documents relating to the

allegations which he knew he was not supposed to share with Humphreys, he took notes regarding

those documents and faxed them to Humphreys (who was then on administrative leave).

## VIOLATIONS OF GAAP AND SEC REGULATIONS

205.    The SEC regulates statements by companies "that can reasonably be expected  to

reach investors and the trading markets, whoever the intended primary audience." SEC Release

No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13,

1984). In addition to the periodic reports required under the Exchange Act, management of a

public company has a duty promptly "to make full and prompt announcements of material facts

regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep.

(CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970). The SEC has emphasized

that "[i]nvestors have legitimate expectations that  public companies are making, and will

continue to make, prompt disclosure of significant corporate developments." SEC Release No.

18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19,

1981).

206.    In Securities Act Release No. 6349 (September 8, 1981), the SEC stated that:

> [I]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

207.    In Accounting Series Release 173, the SEC reiterated that "it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

208.    Under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. § 229.303(a)(l)- (3) and Instruction 3.

209.    SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP. Financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1).

210.    The Company's financial statements violated SEC Regulations and GAAP, in that they failed to (i) disclose facts necessary to present a fair and truthful representation of Safety-Kleen's financial position and operations, (ii) provide those disclosures which were required by GAAP, and (iii) identify and address those key variables and other qualitative and quantitative factors which were peculiar to and necessary for an understanding and evaluation of the Company. Consequently, the overall impression created by the financial statements was not consistent with the business realities of the Company's reported financial position and operations.

-79-

211.    The financial statements that were issued by LES and Safety-Kleen during fiscal

1997, fiscal 1998, fiscal 1999 and the first quarter of fiscal 2000 did not fairly and accurately

represent the Company's financial position and operations because they violated the following

principles of GAAP, among others:

a)    that the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (*see* FASB Statement of Concepts No. 5, ¶ 86.a);

b)    that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

c)    that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

d)    that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it -- to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

e)    that financial reporting should provide information about an enterprise's financial performance during a certain time period (FASB Statement of Concepts No. 1, ¶ 42);

f)    that financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g)    that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 80);

h)   that conservatism be used as a prudent reaction in uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶ 95, 97);

i)   that profit is deemed to be realized when a sale in the ordinary course of business is effected (Chapter IA of ARB No. 43, Paragraph 1);

j)   that revenues should ordinarily be accounted for at the time a transaction is completed (APB Opinion No. 10, Paragraph 12);

k)   that revenues and gains generally are not recognized until realized or realizable, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (Statement Of Financial Accounting Concepts No. 5, Paragraph 83);

l)   that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form (Statement Of Financial Accounting Concepts No. 2, Paragraph 160);

m)   that contingencies that might result in gains usually are not reflected in the accounts since to do so might recognize revenue prior to its realization (Statement of Financial Accounting Standards No. 5, Paragraph 17);

n)   that losses from contingencies should not be recorded unless it is probable that a loss has been incurred and the amount can be reasonably estimated (FAS  Statement of Accounting Standards No. 5, ¶ 14);

o)   that the cost of an asset should be spread over the expected useful life so as to allocate that cost as equitably as possible over the periods during which services are obtained from the use of the asset (Accounting Research Bulletin 43); and

p)   that intercompany balances should be eliminated when preparing consolidated financial statements (Accounting Research Bulletin 51).

212.   In sum, the Company presented its results, including its revenue, profit margins, and earnings, for the interim periods and fiscal years 1997, 1998, 1999, and first quarter of fiscal 2000, in a manner which violated GAAP, SEC regulations, and principles of fair reporting.  As a

result, the Company's Offering Memoranda, Registration Statements, SEC filings, and other public statements containing financial information for those periods were materially false and misleading and failed to disclose the true financial status of LES and Safety-Kleen. Among other things, this false information prevented investors from discovering that the Company's ability to service its debt, including the Bonds, was at severe risk.

213.    The adverse information misrepresented and/or concealed by Defendants is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## PwC'S VIOLATIONS OF GAAS

214.    As the independent auditors of LES and Safety-Kleen, PwC assisted in the preparation of the Company's annual and quarterly financial statements, reviewed those financial statements and the text that accompanied them in the Company's SEC filings, and audited the annual financial statements. PwC was also responsible for, among other things, examining the Company's system of internal controls to identify any material weaknesses or reportable conditions which might impact the accuracy or reliability of the Company's financial statements. PwC was required to perform its audit services according to GAAS, which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue an unqualified opinion only if the Company's financial statements were fairly presented in accordance with GAAP.

-82-

215.    During its audits for fiscal 1997, fiscal 1998, and fiscal 1999, PwC discovered material misstatements in the Company's financial statements, and suggested to the Company's management and to the Audit Committee that adjustments be made to correct those misstatements. When management declined to make those adjustments, PwC listed them on a "summary of unadjusted differences," or "SUD." All of the items on the SUD were adjustments that PwC proposed to correct accounting practices that did not comply with GAAP. At the end of each fiscal year, PwC presented a report to the Audit Committee which included a report on the significant items on the SUD. The Audit Committee, like management, failed to make a single one of the adjustments on the SUDs for fiscal 1997, fiscal 1998, or fiscal 1999.

216.    In fiscal 1997, the unadjusted differences reflected on the SUD exceeded 10% of reported cash flow. In fiscal 1998, they were about 22% of pre-tax income, and nearly 25% of after-tax income. In fiscal 1999, they exceeded 5% of net income. PwC violated GAAS by issuing unqualified opinions on each year's financial statements despite the failure to correct these material errors.

217.    There were also material misstatements in the fiscal 1997, fiscal 1998, and fiscal 1999 financial statements that PwC failed to detect during its audits. As a result of its longstanding relationship with the Company and Laidlaw which dated back to the 1980s, and the nature of the accounting and auditing services rendered to the Company, PwC personnel were regularly present at Safety Kleen's corporate headquarters throughout the year and had continual access to and knowledge of Safety Kleen's private and confidential corporate, financial and business information, including internal monthly financial records, Board minutes and other internal memoranda, and thus were, or should have been, aware of the true facts as alleged herein

-83-

concerning the true nature of the Company's financial condition. If PwC had conducted its audits in compliance with GAAS, and not recklessly, it would have detected those misstatements and the improper accounting practices that caused them, and would have either insisted that this information be disclosed to investors, or declined to issue unqualified opinions on the Company's financial statements.

218.   GAAS requires that each audit be planned and performed with an attitude of processional skepticism. PwC failed to do so, and instead accepted numerous representations by the Company's management at face value, without applying an appropriate degree of professional skepticism.

219.   PwC issued unqualified audit opinions on LES's and Safety-Kleen's financial statements for fiscal 1997, 1998 and 1999, stating that PwC's audits were performed in conformity with GAAS and that, in PwC's opinion, the financial statements "fairly presented" the financial position and results of LES (and later Safety-Kleen) in accordance with GAAP. However, as alleged herein, PwC's audit opinions were materially false and misleading, the manner in which the Company's financial results were reported in the Company's financial statements represented an extreme departure from GAAP, and PwC's audits represented an extreme departure from GAAS.

220.   GAAS requires that an auditor exercise due professional care in performing an audit and in preparing the audit report. PwC failed to do so. Among other ways, PwC failed to adhere to professional standards by: inadequately planning its audit; inadeqately staffing and supervising its audit; failing to understand the Company's internal control structures sufficiently;

-84-

failing to obtain sufficient competent evidential matter; and improperly issuing unqualified audit reports.

## PwC Failed to Plan its Audit Adequately

221.    GAAS provides that an audit is to be adequately planned. Audit planning involves developing an overall strategy for the expected conduct and the scope of the audit. In planning an audit, the auditor must obtain knowledge of the matters which relate to the nature of the entity's business, its organization, and operating characteristics. The auditor is required to design the audit with professional skepticism (AU, Section 316) in order to provide reasonable assurance of detecting errors and irregularities (AU 311.03), material misstatements (AU 312) or fraud (AU 316). The auditor also must design the audit plan to account for the possibility that an entity may be unable to continue as a going concern (AU 341).

222.    PwC failed to comply with GAAS because it failed to design its audit plan to provide reasonable assurance of detecting material error as required by Statement of Auditing Standards No.82, *The Auditor's Responsibility to Detect and Report Errors and Irregularities* (AU 316A).

223.    PwC was required under GAAS to obtain knowledge of the Company's business, and apply analytical procedures in planning for its audit. In the course of performing such procedures, PwC knew, or should have known, the facts referenced above which indicated that it should perform an extensive audit of the Company's derivative transactions, fixed assets, revenue, debt and operating costs. PwC prided itself on its long-standing relationship with LES/Safety Kleen which dates back to the 1980s. In fact, PwC's own working papers indicate that PwC sought to have continual presence at Safety Kleen in order to provide even greater services to the

-85-

Company. The working papers further indicate that LES/Safety Kleen thought of PwC as "our accountants," thus reinforcing the concept that PwC knew or should have known the facts referenced above.

224.    In addition, PwC had access to and reviewed management schedules showing projected costs, revenues, and fixed assets for each of Safety-Kleen's divisions, as well as management's subsequently prepared schedules showing actual costs, revenues and fixed assets for each fiscal year. PwC compared or should have compared each year's schedules to the prior year's schedules showing actual costs, revenues and fixed assets for each division.

225.    PwC also had access to the Senior Credit Facility, which contained a provision requiring interest rate protection for at least 40% of the borrowings thereunder. PwC identified this fact during the course of its audit yet took no steps to independently verify the existence, terms or conditions of the various interest rate swaps in which the Company was engaged. Had PwC confirmed the interest rate swap agreements, it would have seen that the Company was taking on risk and receiving premium payments from counterparties for doing so. PwC would then have been required to expand its testing of the company's cash accounts to determine the proper disposition of the cash received. Specifically, PwC would have learned that the Company was improperly treating these cash receipts as current year revenue. PwC failed to take these audit steps.

226.    In developing its audit plan, GAAS required PwC to consider the so called "audit risk" that PwC might fail to recognize that the Company's financial statements were materially overstated as a result of errors or irregularities. (AU Section 312.02, note 1.) GAAS sets out a list of red flags that auditors should look for in determining audit risk relating to misstatements

-86-

arising from fraudulent financial reporting (AU Section 316.16-18), many of which were present

here, including:

- Motivations for management to engage in fraudulent financial reporting, including a significant portion of management's total compensation being represented by bonuses, stock options, or other incentives, the value of which was contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow;

- Failures by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process, including lack of effective oversight by the Board or Audit Committee;

- Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work.

- High degree of competition or market saturation, accompanied by declining margins.

- Inability to generate cash flows from operations while reporting earnings and earnings growth.

- Assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties, or that are subject to potential significant change in the near term in a manner that may have a financially disruptive effect on the entity—such as ultimate collectibility of receivables, timing of revenue recognition, realizability of financial instruments based on the highly subjective valuation of collateral or difficult-to-assess repayment sources, or significant deferral of costs.

- Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain.

227.    PwC recognized the presence of significant audit risks at Safety-Kleen. In its audit

planning documents for fiscal 1997, PwC acknowledged that the Company's management was

"often aggressive with accounting matters," and that the cost savings projections for the Safety-

Kleen Acquisition were aggressive. In preparation for the 1998 audit, PwC prepared a "Business

Risk Assessment" which stated that PwC had observed "unusually aggressive or creative

accounting practices" at Safety-Kleen, that "the company has historically used aggressive

accounting practices related to depreciation and purchase price allocation," that rapid growth was

placing stress on the resources of management or the Company, that the Company was dominated

by a few individuals, that the Board as a whole lacked sufficient and timely information with

which to monitor the Company's financial position and operating results and business risks, that

management was under pressure to achieve more favorable earnings, and that management's

compensation was based on the achievement of accounting-based performance measures. When

planning the fiscal 1999 audit, PwC recorded its observations that Safety-Kleen used "unusually

aggressive or creative accounting practices" and "aggressive accounting policies," that the

Company's accounting involved significant accounting estimates involving subjective judgments

or uncertainties, that the Company's accounting estimates were "consistently optimistic," that

Safety-Kleen had insufficient management depth, and that there was "unusually heavy pressure

[on management] to achieve accounting-based performance objectives." Despite these and other

acknowledgments of the Company's aggressive accounting practices and other significant audit

risks, PwC failed to develop and/or follow an adequate audit strategy to mitigate against those

risks.

228.    Another fact that should have raised an immediate red flag to PwC was the fact

that, at least until March 23, 1999, Haworth – a senior executive officer of Safety-Kleen's parent

company, Laidlaw – was Chairman of Safety-Kleen's Audit Committee. This fact should have

raised significant concern for PwC regarding the effectiveness and reliability of the Audit

Committee.

229.    PwC either: (1) failed to recognize these red flags and to plan and implement an adequate audit that took into account those audit risks, or (2) if it had an adequate audit plan it failed to follow it, or (3) if it had an adequate plan and followed it, PwC ignored the results of its findings and issued its unqualified opinions anyway.

## PwC Failed to Supervise its Audit Adequately

230.    GAAS requires that the auditor adequately supervise employees conducting the fieldwork (SAS # 22, AU Section 311).

231.    Supervision involves directing the efforts of assistants involved in accomplishing the objectives of the audit and determining whether those objectives were accomplished. The work performed by each assistant must be reviewed for adequacy and evaluated to determine whether the audit results are consistent with the conclusions expressed in the auditor's reports.

232.    PwC failed to follow these required standards in its audits of the Company's financial statements. PwC violated GAAS by: (1) failing to provide adequate direction to staff personnel to gather the required evidential matter that would have unveiled the accounting violations described above; and (2) failing to perform adequate review of the work performed by staff members in connection with the audit, which would have uncovered the failure of PwC personnel to inspect supporting documentation for the derivative transactions, the fictitious journal entries, the improper capitalization of costs, the improper changes to environmental reserves, the improper extension of depreciable lives for fixed assets, and other matters.

## PwC Failed to Understand Safety-Kleen's Internal Control Structure Sufficiently

233.    GAAS Standard of Field Work No. 2 requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine

whether reliance on those controls was justified, and if such controls are not reliable, to expand

the nature and scope of the auditing procedures to be applied. A company's internal control

structure consists of policies and procedures established by the company to provide reasonable

assurance that its objectives will be achieved. The auditor must focus on the substance of

management's policies and procedures, not their form, because management may establish

appropriate policies and procedures but not act on them.

234.    An auditor must perform procedures to obtain a sufficient understanding of the

three elements of a company's internal control structure: the control environment, the accounting

system, and control procedures. The control environment, which includes management's integrity

and ethical values, is the foundation of internal control and sets the tone of the organization. The

auditor must assess control risk -- the risk that a material misstatement contained in the

company's financial statements will not be detected and prevented on a timely basis by the

company's internal control structure policies. Indeed, the ultimate purpose of assessing control

risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial

statements.

235.    In the course of auditing Safety-Kleen's financial statements, PwC knew or should

have known facts which demonstrated that it had failed to sufficiently understand Safety-Kleen's

internal control structure and control risk. As quickly became apparent during the Restatement

process, Safety-Kleen's internal control weaknesses and deficiencies were pervasive. Indeed,

soon after the Safety-Kleen Acquisition, during the initial conversion of accounting systems,

Safety-Kleen missed its weekly payroll four times. In addition, problems encountered during that

-90-

computer conversion caused the Company to be unable to match customer payments with accounts receivable.

236.    Despite this, PwC failed to expand the scope of its procedures adequately, and as a result, issued unqualified audit opinions on Safety-Kleen's financial statements when such statements materially overstated the Company's revenues, net income, earnings per share, assets, and stockholders' equity.

### PwC Failed to Obtain Sufficient Competent Evidential Matter

237.    GAAS provides that accounting data alone is insufficient to support an opinion on financial statements. (SAS Nos. 31 and 48, AU Section 326.16, SAS No. 1 Standard of Field Work). Before rendering an opinion on financial statements, the auditor must obtain sufficient, competent "evidential matter" to afford a reasonable basis for the opinion. (AU 326) "Evidential matter" consists of the underlying accounting data and all corroborating information available to the auditor. (AU Section 326.15.) Corroborating evidential matter includes both documentation obtained during the field work (e.g., checks, invoices, contracts, and independent confirmations) and information obtained from inquiry, observation, inspection and physical examination. (AU Section 326.17).

238.    Management's representations are not a valid substitute for the application of audit procedures to form a reasonable basis for an auditor's opinion of financial statements (SAS No. 19). An auditor must establish and perform a confirmation process with third parties to verify information utilized in the audit models (SAS No. 67). Where a random sampling audit reveals material discrepancies or errors, the audit procedures should be expanded to determine the magnitude of such errors, or the auditors should consider alternative procedures that would

provide sufficient evidence to form a conclusion pursuant to Financial Accounting Standards Board Statement on Accounting Standards 31, 39.

239.    In the course of auditing Safety-Kleen's financial statements, PwC either knew or should have known facts which indicated that it had failed to obtain sufficient competent evidential matter to afford a reasonable basis in opining on Safety-Kleen's financial statements. PwC's staff was frequently present at Safety-Kleen corporate headquarters and had access to Safety-Kleen internal corporate books and records. In addition, PwC's staff had access to Safety-Kleen's private and confidential financial and business information. Despite the availability of such records and information, PwC failed to obtain, through inspection, observations, inquiries, confirmations and other audit procedures, sufficient competent evidential matter to afford a reasonable basis for its opinions on Safety-Kleen's financial statements. As a result, PwC issued unqualified opinions on Safety-Kleen's financial statements for 1997, 1998 and 1999 when such financial statements materially overstated the Company's revenues, net income, earnings per share, assets, and stockholder's equity.

240.    Since the accounting manipulations were effected by the use of numerous journal entries and adjustments, many of which were extremely large, occurred at the end of a period, and were without any support or justification, an examination of those entries (as required by GAAS) would, by itself, have raised numerous red flags. PwC either failed to examine these entries or failed to make inquiries or obtain third party confirmation regarding the validity of those entries. In any event, PwC clearly failed to make any effort to obtain sufficient, competent corroborating data to support the entries as required by GAAS. (SAS Nos. 31, 48, and 80, AU Section 326.16.) Moreover, these entries were made personally by the Company's senior management, which

-92-

constituted management overrides and a "reportable" violation of internal controls. (SAS # 82, AU Section 316).

241.    Additionally, PwC accepted at face value the adjustments that were made by management with regard to depreciation, adjustments to environmental reserves, and the capitalization of certain costs, all in violation of GAAP. PwC did not identify any significant industry studies or analyses performed by management to extend the useful lives of the fixed assets. They accepted the reduced closure costs associated with certain landfills in spite of the fact that many of these costs had been established by the Company's management pursuant to various acquisitions that occurred in the most recent prior years.

242.    PwC also accepted management's representations at face value on numerous issues, and neglected to confirm the accuracy of those representations with independent sources, even when doing so would have been very easy. For example, PwC accepted management's representations regarding the number and nature of its derivative transactions, without sending any confirmations to the counterparties to those transactions. Had PwC sent those confirmations, or even reviewed the actual derivative contracts entered into by the Company, it would have discovered that those derivative transactions actually increased, rather than decreased, the risk to the Company. Instead of participating in "pure vanilla" interest rate swaps, as the Company represented in the disclosures to its financial statements, the Company was engaged in riskier transaction in which it took on greater risk in return for premium payments.

243.    Had PwC inspected the derivative contracts or sent confirmations, PwC also would have seen that the Company was receiving millions of dollars in premiums and cash termination settlements in connection with certain of these transactions and would have been required to

-93-

investigate the Company's accounting treatment of those payments. PwC would have learned that

the Company was in violation of GAAP by reporting the cash received in these transactions as top

line revenue.

## PwC Improperly Issued Unqualified Audit Reports

244.   The Standards of Reporting under GAAS (SAS No.1, AU 150.02) provide the

following with respect to independent auditors' reports:

> (1)   The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

> (2)   The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

> (3)   Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

> (4)   The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases, where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

245.   PwC issued unqualified audit opinions on the Company's fiscal 1997, 1998 and

1999 financial statements, falsely stating that those financial statements had been prepared in

accordance with GAAP. PwC's audit reports failed to identify circumstances in which GAAP had

not been consistently observed in relation to prior periods, including for example the Company's

failure to apply a consistent approach to the timing of revenue recognition.

246.   PwC's reports did not disclose any deficiencies in the informative disclosures

contained in the financial statements. A number of those disclosures were inadequate. For

example, the Company's extension of its assets' useful lives was a change in accounting estimates

for which disclosure was required to be made, but was not. In addition, the informative

disclosures regarding derivative transactions were inadequate and, indeed, false. Without taking

the necessary audit steps to confirm the disposition of money received by the Company from

derivative transactions, PwC accepted the Company's explanation that differentials paid as

received were being treated as adjustments to interest expense when, in fact, the Company was

additionally receiving substantial premiums and cash termination settlements which were being

included in top line revenue. PwC failed to take the necessary steps to assure itself that the so

called "informative disclosures" upon which it was opining were true and accurate, and instead

issued an unqualified opinion that the financial statements were presented in accordance with

GAAP when they were not.

247.    PwC substantially departed from compliance with GAAS by issuing unqualified

audit opinions when it had knowledge of material errors and irregularities in the Company's

financial statements, and when its auditing procedures had been performed so recklessly as to

amount to no audit at all. PwC was required under GAAS to (1) revise the financial statements,

(2) issue a qualified or adverse opinion, or (3) withdraw from the audit and notify the SEC. PwC

did none of these, contrary to GAAS.

## THE AUDIT COMMITTEE FAILED IN ITS DUTIES

248.    The Audit Committee's responsibilities were set forth in a charter which was

adopted by the Board and disclosed to investors. The charter required the Audit Committee to,

among other things:

a.  review and assess the effectiveness of management's policies and practices concerning financial reporting;

b.  question management and the external auditor regarding significant financial reporting issues and the method of resolution;

c.  review general accounting trends and issues of auditing policies, standards and practices, which affect or may affect the company;

d.  review with management and the external auditor any proposed changes in major accounting policies, the presentation and impact of significant risks and uncertainties and key estimates and judgments of management that may be material to financial reporting;

e.  perform analytical procedures, such as review, comparison, inquiry and discussion with management to obtain adequate explanations for all significant variances and balances and financial ratios between actual results of comparative periods and budgeted results for the period being reviewed;

f.  review and monitor management's internal control procedures, programs and policies and assess the adequacy and effectiveness of internal controls over the accounting and financial reporting systems within the company, with particular emphasis on controls over computerized systems;

g.  review the audit plans of the internal and external auditors with management including the degree of coordination in those plans and make inquiry as to the extent to which the planned audit scope can be relied upon to detect weaknesses in internal control or fraud or other illegal acts;

h.  review any problems experienced by the external auditor in performing the audit, including any restrictions imposed by management or significant accounting issues on which there was a disagreement with management; and

i.  review such litigation, claims, transactions or other contingencies as the internal auditor, external auditor or any officer of the company may bring to its attention.

249.  Rather than perform these functions in an independent manner, the Audit

Committee relied completely on PwC to tell them what they needed to know. Thus, although

investors were led to believe that the Company had a functional audit committee that would serve as an independent "check and balance" on management and PwC, the Audit Committee added no real value to the process of ensuring the accuracy of the Company's financial reporting.

250.    Even when PwC brought violations of GAAP to the Audit Committee's attention in the form of SUDs, and informed the Audit Committee that management had refused to make PwC's proposed adjustments, the Audit Committee did nothing. The Audit Committee never questioned management about those items, and never required that any of PwC's proposed adjustments be made. The Audit Committee also never considered whether there were additional errors, beyond those on the SUD, that PwC had failed to detect.

251.    The Audit Committee's failure to require any of the adjustments on the SUDs was based on PwC's assurances that the errors were not material, and that PwC would issue an unqualified audit opinion even if they were not corrected. The Audit Committee members never inquired as to why PwC believed the errors were not material, and never did any analysis of their own of the materiality of those errors, despite having been informed by PwC that its "rule of thumb" for determining materiality to the income statement was 5%. In fact, the errors on the SUDs were material each year. The Audit Committee members had all of the information necessary to make that determination, had they bothered to make the effort.

252.    In addition, as alleged herein, the Audit Committee overrode the advice of PwC by insisting upon the recording of a $65 million restructuring charge in the third quarter of fiscal 1998, despite being told by PwC that they did not approve of the charge.

253.    The Audit Committee also did nothing to independently monitor the progress of the integration of the computer systems following the Safety-Kleen Acquisition, despite knowing

that those systems were a critical element of the Company's internal controls, as well as a key to the achievement of cost savings in the merger. The person in charge of the Company's computer systems was never asked to make a report to the Audit Committee, and the Audit Committee never got any information directly from the people in the field regarding the adequacy of controls over computerized systems. Instead, they relied completely on PwC to monitor the integration of those systems, and the internal controls in general.

254.    The Audit Committee members were severely reckless in failing to fulfill their obligations, and in approving financial statements for each fiscal year that contained material false statements.

## FRAUD CREATED THE MARKET FOR THE BONDS

255.    If it were not for the false and misleading statements in the Company's financial statements, the Company could not have issued the Bonds. Several of the directors who approved the issuance of the Bonds, including Tippie, have admitted that they would not have done so if they had known the Company's true financial condition.

256.    But for Defendants' fraud, there would have been no viable market for the Bonds. Therefore, fraud created the market for the Bonds.

## THE MARKET FOR THE BONDS

257.    At all relevant times, the market for the Bonds was an efficient market wherein all current and publicly available information with respect to the Company was reflected in the prices at which Plaintiffs and other investors bought and sold the Bonds. Plaintiffs relied on the integrity of the market price of the Bonds.

258.    News stories regarding Safety-Kleen were reported in numerous widely-published sources, including The Wall Street Journal, Dow Jones News Service, Business Wire, PR Newswire, and Bloomberg.

259.    Safety-Kleen was consistently covered by securities analysts from at least 19 financial institutions, including many major brokerage houses. Among the institutions that issued investment reports or commentary on Safety-Kleen to the public were TD Securities, Bear Stearns & Company, CIBC World Markets, Goldman Sachs, Smith Barney, Merrill Lynch, Credit Suisse First Boston, Lehman Brothers, DLJ Securities, Deutsche Bank Securities, Raymond James & Associates, RBC Capital Market, Daewoo Securities, Renaissance Capital, Ford Investor Service, Instinet Corp., Laguna Research, Standard & Poors, Nesbitt Burns.

260.    The market for the Bonds was primarily an institutional market. The vast majority of the trading in the Bonds was accomplished by institutional investors and professional investment managers, including CGTC, who kept themselves fully apprised of publicly available information relating to the Bonds.

261.    At least 9 dealers, including several major brokerage houses, made a market in the Bonds. These included TD Securities, NationsBanc Montgomery Securities, Goldman Sachs, Bear Stearns & Company, Inc., Deutsche Bank, RBC Dominion, Grantchester, Miller Tabak Roberts, and Imperial Capital.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## PROXIMATELY CAUSED PLAINTIFF'S DAMAGES

262.    A corporate bond represents a debt owed by the issuer of the bond to the holder of the bond. A primary determinant of the price of a bond is the market's perception of the likelihood of default on the bond.

263.    The publication of materially false information regarding the Company's financial condition and results caused investors and the marketplace to underestimate the probability of default on the Bonds. The Company led investors to believe that there was only a modest risk of default, when in fact that risk was substantial. As a result, the Bond prices were artificially inflated at all times prior to March 6, 2000.

264.    CGTC was induced to purchase Bonds on behalf of Plaintiffs by Defendants' false statements alleged herein, including false historical financial statements which painted an inaccurate picture of the Company's ability to service its debt. If CGTC had known the Company's true financial condition, it would have known that the risk of default on the Bonds was significantly higher than represented, and it would not have purchased the Bonds on behalf of Plaintiff.

265.    At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC had knowledge of the wrongful conduct alleged herein, or of the information misrepresented or withheld by Defendants, and they could not reasonably have discovered such information.

266.    The Company's March 2000 revelations of accounting irregularities, of the withdrawal of PwC's audit opinions, and of the need to restate the Company's prior financial

-100-

statements immediately increased the perceived probability of default on the Bonds, causing the price of the Bonds to drop precipitously, and causing damage to Plaintiff.

267.    The Defendants' publication of false financial information, including in the Company's Forms 10-K, Offering Memoranda, and Registration Statements, was a substantial factor in causing Plaintiff's injury.

## TOLLING OF THE STATUTE OF LIMITATIONS

268.    The statutes of limitations on Plaintiff's claims began to run no earlier than March 6, 2000. Prior to that date, Plaintiffs did not know and could not have reasonably discovered the facts giving rise to its claims.

269.    On April 13, 2000, a class action was filed on behalf of all purchasers of Safety-Kleen securities, including the Bonds. That action was subsequently consolidated with another class action filed on July 12, 2000 on behalf of Bond purchasers. On January 8, 2003, a class was certified in the class action, consisting of all those who purchased or acquired 2008 Bonds or 2009 Bonds between April 17, 1998 and March 9, 2000. Subsequently, by order dated October 29, 2004, the class was decertified with respect to the claims under Sections 10(b), Section 18 and Section 20(a) of the Securities Exchange Act of 1934.

270.    By order of the Court, the effect of the decertification order in the class action was stayed, and the statutes of limitations on the individual claims of Plaintiffs and other class members were tolled, until thirty days after the filing of an affidavit confirming that notice of the decertification order had been mailed to the class. That affidavit was filed on December 23, 2004, making January 22, 2005 the effective date of the decertification order.

271.    The statutes of limitations on all of the claims asserted in Plaintiff's complaint were tolled from the time the class action was filed until January 22, 2005.

272.    All of Plaintiff's claims have been brought within the applicable statutes of limitations, after giving effect to tolling.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Bullock, Winger, Humphreys and Bragagnolo

273.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

274.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Bullock, Winger, Humphreys, and Bragagnolo.

275.    Defendants Bullock, Winger, Humphreys, and Bragagnolo, as senior officers and/or directors of the Company, individually and collectively were responsible for, among other things, the Company's financial accounting system, the Company's system of internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of the Company and contained in reports and other documents, including those filed with the SEC.

276.    Defendants Winger and Humphreys were instrumental in the preparation and dissemination of the Company's public financial statements. Each of them, as well as defendant Bullock, approved the Company's financial statements, the Registration Statements and Offering Memoranda relating to the Bonds, and the Company's Forms 10-K and other SEC filings. In addition, each of them signed the Registration Statements and Forms 10-K. As alleged herein, all

-102-

of those documents contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading. The Company's fiscal 1997, fiscal 1998 and fiscal 1999 audited financial statements have been withdrawn and restated by material amounts. Thus, those financial statements and management's discussion thereof were all materially false when issued (see Accounting Principles Board Opinion No. 20).

277.    As detailed in preceding paragraphs, the Company's accounting practices were manipulated in a variety of ways in order to overstate the Company's financial results. Each of Defendants Bullock, Winger, Humphreys and Bragagnolo had actual knowledge of material misstatements in each year's financial statements. Winger and Humphreys had such knowledge by virtue of their participation in, and express direction of, the accounting manipulations that led to the misstatements. Bullock had such knowledge by virtue of his position as Chairman of the Board, his relationships with Winger, Humphreys, and Haworth, and the pressure which he exerted upon the Company's management to meet earnings expectations at all costs. Bragagnolo had such knowledge because he was aware that the Company's published financial statements were materially different from, and indeed more favorable than, the Company's internal financial statements.

278.    The accounting manipulations were undertaken personally by, and/or under the express direction of, Defendants Winger, Humphreys, and Bullock, who were each fully aware of the manipulations and their material impact on the Company's financial statements. These Defendants, together with Defendant Haworth, were the source of most, if not all, of the Company's irregular accounting practices.

279.    The accounting manipulations alleged herein were undertaken, in part, because Safety-Kleen's actual financial results were falling short of expectations following the Safety-Kleen Acquisition. Defendants Winger, Humphreys, Bullock and Bragagnolo (all of whom had served as executive officers and/or directors of LES) had expected to be able to increase the Company's future reported earnings through the achievement of significant costs savings and synergies, and by reducing Old Safety-Kleen's environmental reserves – which they believed were conservative – and adding the amount of the reduction to reported income. However, upon assuming their senior management roles with the new Safety-Kleen, these Defendants found that they could not report increasing revenues or meet analysts' earnings estimates without cooking the books.

280.    Defendants Winger, Humphreys, and Bragagnolo had a clear incentive to inflate the Company's financial results, and hence the price of its securities, because their ability to maintain their positions at Safety-Kleen and receive increased remuneration depended on their ability to have Safety-Kleen succeed. For example, the Company's Executive Bonus Plan (the "Plan") provided for bonuses to executive officers and key employees of the Company and its subsidiaries which were directly related to the publicly reported financial results of the Company, based upon one or more of the following criteria:

      (1)     earnings per share;
      (2)     net income;
      (3)     stock price;
      (4)     operating profit;
      (5)     earnings before interest, taxes, depreciation and amortization ("EBITDA");
      (6)     return on assets;
      (7)     total shareholder return;
      (8)     level of fixed or variable costs; and
      (9)     quantity of waste managed.

The Company's executive officers were also eligible to receive additional cash compensation under an annual management incentive plan ("MIP"), based upon, *inter alia*, the Company's publicly reported financial performance during the last fiscal year as measured by earnings per share. All of this compensation was in addition to the executive officers' salaries and stock options, which were granted annually and were designed to provide an incentive for those primarily responsible for the growth and success of the Company.

281.    Defendant Bullock also had a clear incentive to inflate the Company's financial results because, as an executive officer of Laidlaw, he was subject to a similar bonus plan to the Plan at Safety-Kleen, and improved reported financial performance at the Company led to increases in his bonuses.

282.    Defendants Bullock, Winger, Humphreys and Bragagnolo knew, or were reckless in not knowing, that the Company's reported financial results and other public statements were materially false and misleading as a result of the accounting manipulations alleged herein, and therefore knew or were reckless in not knowing of the falsity of the Registration Statement and Offering Memorandum for the Bonds, as well as the Company's Forms 10-K and other SEC filings and press releases.

283.    Defendants Bullock, Winger, Humphreys, and Bragagnolo knew, or were reckless in not knowing, that the Company's system of internal controls was ineffective.

284.    Each of Defendants Bullock, Winger, Humphreys, and Bragagnolo was a Director and/or an executive officer of the Company who had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other public

statements which Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the reports, press releases, public filings, financial statements and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected.

285.    Winger, Humphreys and Bragagnolo, as executive officers of the Company, had direct and supervisory involvement in and controlled the Company's day-to-day operations. Bullock was directly involved through his role as Chairman of the Board and CEO of the Company's largest shareholder.

286.    Winger, Humphreys, Bragagnolo and Bullock acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

287.    The materially false and misleading statements by these Defendants were made in connection with the purchases of the Bonds by Plaintiff.

288.    By virtue of an agreement between Plaintiffs and CGTC, CGTC made the investment decisions on behalf of Plaintiff. As a result, reliance by CGTC constitutes reliance by Plaintiff.

289.    Plaintiffs and CGTC relied on the materially false and misleading statements of these Defendants and the Company in purchasing the Bonds. In particular, before purchasing Bonds on behalf of Plaintiff, CGTC read and relied on the Company's most-recently published audited financial statements, as well as subsequent quarterly financial statements.

290.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages.

291.    At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC knew of any of the false and/or misleading statements and omissions.

292.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Tippie and Wareham

293.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

294.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Tippie and Wareham

295.    As alleged herein, the Company's public financial statements for fiscal 1998 and fiscal 1999, as contained in the Registration Statement and Offering Memorandum relating to the 2009 Bonds and/or in the Company's Forms 10-K and other SEC filings, contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading. Tippie and Wareham approved each of these financial statements and filings, and signed the Registration Statement and Forms 10-K. Tippie and Wareham have admitted that these financial statements and filings were materially false.

296.    Defendants Tippie and Wareham were directors of the Company and served on the Audit Committee of the Board. As members of the Company's Audit Committee, these defendants were responsible for fully understanding the Company's accounting policies,

-107-

procedures and internal control systems, and were in direct contact with the Company's auditors. They also had the authority and duty to oversee, review and examine statements made in the name of the Company contained in reports and other documents, including financial statements filed with the SEC, and to be certain that the Company's financial condition was reported in a fair and accurate manner.

297.    By virtue of their positions as directors and Audit Committee members, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the accounting and financial reporting processes of the Company, including the content and dissemination of the financial statements and public filings which Plaintiffs contends are false and misleading.

298.    Tippie and Wareham were aware of the Company's accounting procedures and knew, or were reckless in not knowing, that those procedures were not in keeping with industry standards or GAAP.  They also knew, or were reckless in not knowing, that utilizing these irregular accounting procedures would result in the Company's financial statements being materially false and misleading and not being prepared in accordance with GAAP.

299.    As detailed in preceding paragraphs, the Company, through its directors and officers, manipulated the Company's accounting practices in order to misstate the Company's financial results.  Tippie and Wareham knew facts and had access to information indicating that the Company's accounting did not comply with GAAP, and that its financial statements were materially false.  For example, they were presented with statements of unadjusted differences each year which showed that the financial statements failed to comply with GAAP in numerous respects, and that they were materially misstated.

300.    Other accounting manipulations were so egregious, and the resulting misstatements so significant, that the members of the Audit Committee were grossly reckless in failing to detect them.  For example, at the time the Company was engaging in improper derivative transactions (and improperly accounting for such transactions), the subject of derivatives was a "hot topic" in the financial and business communities.  It was well known at that time that a number of companies had been encouraged by their bankers to invest in derivatives that were riskier than they were led to believe.  Any reasonably diligent business person would have known of the potential problems associated with derivatives, and would have taken steps to assure themselves of the propriety and advisability of their company's derivative investments.  Defendants Tippie and Wareham were, at a minimum, grossly reckless in failing to do so.

301.    Moreover, each of these defendants, as members of the Audit Committee, was grossly reckless because they relied entirely on PwC to evaluate the Company's internal controls and the accuracy of the Company's financial reporting, without taking any steps to ensure that such reliance was reasonable.

302.    Defendants Tippie and Wareham acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

303.    The materially false and misleading statements by these Defendants were made in connection with the purchases of the Bonds by Plaintiff.

304.    By virtue of an agreement between Plaintiffs and CGTC, CGTC made the investment decisions on behalf of Plaintiff.  As a result, reliance by CGTC constitutes reliance by Plaintiff.

305.    Plaintiffs and CGTC relied on the materially false and misleading statements of these Defendants and the Company in purchasing the Bonds. In particular, before purchasing Bonds on behalf of Plaintiff, CGTC read and relied on the Company's most-recently published audited financial statements, as well as subsequent quarterly financial statements.

306.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages.

307.    At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC knew of any of the false and/or misleading statements and omissions.

308.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT III

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against PwC

309.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

310.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against PwC.

311.    As "independent" auditors of the Company, PwC had a duty to examine the Company's financial statements in accordance with GAAS to determine, among other things, whether the financials were presented in accordance with GAAP. Further, in connection

therewith, PwC had a duty to disclose to management, and in particular the Audit Committee, any defects in the system of internal controls.

312.    As alleged herein, the Company's public financial statements for fiscal 1997, 1998 and 1999, which were audited by PwC, were materially false and misleading. These financial statements, which were contained within the Registration Statement and Prospectus relating to the 2009 Bonds, and/or in the Company's other SEC filings, including its Form 10-K filings, contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading. The Company's fiscal 1997, 1998 and 1999 audited financial statements have been withdrawn and restated by material amounts. Thus, those financial statements and management's discussion thereof were all materially false when issued (see Accounting Principles Board Opinion No. 20).

313.    PwC's unqualified audit opinions with respect to the Company's fiscal 1997, 1998 and 1999 financial statements were materially false and misleading, in that they falsely represented that PwC had audited the financial statements in accordance with GAAS and that the financial statements presented fairly, in all material respects, the Company's financial position at each respective fiscal year-end and the results of its operations and cash flows for each of those years in conformity with GAAP.

314.    Inasmuch as Safety-Kleen was a public company, PwC knew and understood that its reports concerning the Company's financial statements would be distributed to the investing public, and that investors would rely and had a right to rely on such reports. PwC knew and understood that its audit opinions would be included in and constituted material parts of the Company's annual reports on Form 10-K filed with the SEC. PwC consented to the inclusion of

its audit opinions in the Offering Memoranda, and to being named in the Registration Statements as a party who had certified the financial statements contained therein. PwC understood that a primary intent of the Company was for PwC's professional services to influence potential purchasers of the Bonds.

315.    In auditing the Company's financial statements, PwC disregarded, in violation of GAAS, glaring irregularities in the Company's books and records and system of internal controls. PwC falsely represented to investors that it had audited the Company's financials in accordance with GAAS and that the Company's financial statements were presented in accordance with GAAP when it issued unqualified audit opinions in connection with the Company's financial statements.

316.    PwC's actions in disregarding these glaring irregularities, holding out to the public and the SEC that it had conducted the audits in accordance with GAAS, and certifying the Company's financial statements as prepared in accordance with GAAP, were intentional or, at a minimum, reckless.

317.    By virtue of its position as independent auditor of Safety-Kleen, PwC had access to key employees of the Company and continual access to and knowledge of Safety-Kleen's confidential corporate, financial, operating, and business information at all relevant times. As a result of the auditing services it provided to Safety-Kleen, PwC personnel were frequently present at Safety-Kleen's corporate headquarters throughout each year. PwC knew or recklessly disregarded Safety-Kleen's true financial and operating condition, and intentionally or recklessly failed to take steps which, as Safety-Kleen's auditor, it could and should have taken to fully and fairly disclose the true facts to the public.

-112-

318.    PwC made or caused to be made statements contained in reports and other documents the Company filed with the SEC which were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts. PwC falsely represented that it had audited the Company's financials in accordance with GAAS, when in fact its audits had not complied with GAAS. PwC also falsely certified the Company's annual financial statements for fiscal 1997, 1998 and 1999 as having been prepared in accordance with GAAP, when it knew or reckless failed to know that these reports contained statements that were materially false and misleading.

319.    PwC knew or was reckless in not knowing that the Company had no factual basis or justification for the accounting practices alleged herein. Nevertheless, PwC continued to certify financial statements whose accuracy was dependent, in material part, on these accounting practices.

320.    At all relevant times, PwC knew that the Company was investing in derivatives. PwC also knew, or should have known based on the plethora of accounting literature and discussion that was circulating about derivatives at that time, that derivatives were a subject that was ripe for controversy and were causing problems for many companies. Despite this, and despite having assured the Audit Committee that it would do so, PwC intentionally failed to send confirmations to the counterparties on the Company's derivatives, or to request or review any of the Company's derivative contracts or transactions during the course of its audits. PwC therefore knew it had no factual basis on which to judge the propriety of those transactions or the Company's accounting therefor. Nonetheless, PwC certified the Company's financial statements, which contained notes regarding the Company's derivative transactions. By doing so, PwC

-113-

intentionally or, at a minimum recklessly, misled investors to believe that it had reviewed the Company's derivative transactions and the accounting therefor, and was satisfied that they were in compliance with GAAP.

321.    In sum, PwC either knew or recklessly disregarded the facts which indicated that the Company's financial statements were materially false and misleading, and issued unqualified opinions on the Company's fiscal 1997, 1998 and 1999 financial statements when such financial statements materially overstated the Company's revenues, net income, earnings, total assets and stockholders' equity.

322.    PwC's scienter is further evidenced by the magnitude by which the Company's financial results were misstated in its financial statements:  more than $500 million over three years.  Absent intentional or reckless conduct, PwC would have detected these misstatements during the course of its audits and either taken corrective action or declined to issue unqualified audit opinions.

323.    PwC also had motive and opportunity to commit the fraud alleged herein.  PwC audited the Company's financial statements and issued audit opinions which it knew would be disseminated to, and relied upon by, investors.  Thus it had the opportunity to commit fraud. PwC's motive derives from its longstanding relationships with the Company, Kleen, Laidlaw and TD Securities, and the fact that it might destroy those relationships, and the lucrative fees derived therefrom, if it failed to issue unqualified opinions or if it otherwise blew the whistle on the fraud occurring at Safety-Kleen.

324.    PwC acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

-114-

325. The materially false and misleading statements by PwC were made in connection with the purchases of the Bonds by Plaintiff.

326. By virtue of an agreement between Plaintiffs and CGTC, CGTC made the investment decisions on behalf of Plaintiff. As a result, reliance by CGTC constitutes reliance by Plaintiff.

327. Plaintiffs and CGTC relied on PwC's materially false and misleading statements in purchasing the Bonds. In particular, before purchasing Bonds on behalf of Plaintiff, CGTC read and relied on the Company's most-recently published audited financial statements, including PwC's audit opinions thereon.

328. These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages.

329. At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC knew of any of the false and/or misleading statements and omissions.

330. The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against TD Securities

331. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

332.     This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against TD Securities.

333.     TD Securities made materially false and misleading statements alleged herein. It played a central role in the preparation of the Offering Memoranda and the Registration Statements. TD Securities drafted the section of the Offering Memoranda that described the Bonds, and attended numerous drafting sessions where the balance of the Offering Memorand were reviewed, discussed, and edited. TD Securities' name also appeared on the cover page of each Offering Memorandum. As TD Securities knew and expected, the Offering Memoranda were then used as the bases for the Registration Statements, and the Offering Memoranda and Registration Statement for each series of Bonds were nearly identical in content.

334.     In addition to making false and misleading statements, TD Securities engaged in other acts which operated as a fraud or deceit upon Plaintiff, in violation of Rule 10b-5(a) and (c). As alleged herein, TD Securities played a central role in the marketing, offering and sale of the Bonds, including taking the lead in due diligence, identifying and contacting potential investors, arranging the Road Show presentations and inviting investors to attend, preparing the Road Show materials, working with management to prepare presentations to rating agencies, and getting the Bonds designated as PORTAL securities by the National Association of Securities Dealers so they could be traded in the secondary market. TD's activities related to the Company's derivative transactions, including arranging transactions which were not for hedging purposes, which violated the Company's loan covenants, and which were used by the Company to inflate its reported revenues, were also acts in violation of Rule 10b-5(a) and (c).

-116-

335.     TD Securities had the obligation as a lead underwriter for the Company's securities to perform adequate due diligence in order to assure itself that the information in the Offering Memoranda and Registration Statements was true and accurate. Had it fulfilled its obligation to perform adequate due diligence, TD Securities would have known that information in the Offering Memoranda and Registration Statements was, in material respects, false and misleading.

336.     TD Securities knew, or should have known, that prospective purchasers of the Bonds, such as Plaintiff, were relying on them to perform the required due diligence.

337.     As a result of its longstanding relationships with the Company and the nature of the underwriting, financial advisory and analyst services rendered to the Company, TD Securities' personnel were regularly present at the Company's corporate headquarters throughout the relevant time period and had continual access to, and knowledge of, the Company's confidential corporate financial and business information through conversations with Company employees and review of the Company's non-public documents. However, rather than conduct any independent review or analysis of such critical matters as the Company's asset valuation, the quality of its receivables, its derivatives activity, its financial data, or the Company's achievement of synergies in its acquisitions, TD Securities' "due diligence" in those areas consisted solely of reliance on representations by management. TD Securities therefore knew of or recklessly disregarded the adverse facts concerning the Company that led to the withdrawal of the Company's financial statements and rendered those statements materially misleading when issued.

338.     Despite being a lender and administrative agent on the Senior Credit Facility which required the Company to enter into non-speculative derivative transactions, and despite arranging numerous derivative transactions for the Company, including several that were generated

-117-

substantial cash payments for the Company and were not for purposes of interest rate hedging, TD Securities did nothing to ensure the Company's compliance with the derivatives-related covenants in its Senior Credit Facility. Nor did TD Securities do any due diligence relating to derivatives during the Bond offering process. TD Securities either knew or recklessly failed to discover that the Company was engaged in speculative derivative transactions and that it was not accurately disclosing its derivatives activity in its financial statements or public filings.

339. TD Securities intentionally, or at least recklessly, failed to fulfill its due diligence obligations. TD Securities either knew about the material misstatements and omissions in the Offering Memoranda and Registration Statements but failed to disclose them, or it failed to do even the most basic due diligence, recklessly failed to discover these misstatements and omissions, and lied about the due diligence actually performed.

340. Nonetheless, TD Securities marketed and sold the 2009 Bonds, and recommended that investors purchase those Bonds, with knowledge of or in reckless disregard of the fact that the Company's public filings were materially false and misleading.

341. TD Securities acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein, and in engaging in the other acts which operated as a fraud or deceit upon Plaintiff.

342. In addition to serving as lead underwriter for the Bonds, TD Securities provided financial advisory services to the Company, and its analysts regularly covered the Company. An affiliate of TD Securities also served as the Company's primary banking institution, and affiliates of TD Securities were lenders under the Senior Credit Facility and counterparties to the Company in derivative transactions. At all relevant times, the Company and Laidlaw were major clients of

-118-

TD Securities, and at times the Company was TD Securities' single largest client. TD Securities was paid tens of millions of dollars for its underwriting and financial advisory work which depended on the successful offering and sale of the Bonds. TD Securities therefore had a motive to commit the fraud alleged herein, since it had an interest in preserving its relationships with the Company and Laidlaw.

343.    TD Securities had the opportunity to commit fraud in connection with the sale of the Bonds, by virtue of its position as lead underwriter and its participation in the preparation of the Offering Memorandum.

344.    TD Securities' scienter is further evidenced by the magnitude by which the Company's financial results were misstated in its financial statements: more than $500 million over three years. Absent intentional or reckless conduct, TD Securities would have detected these misstatements during the course of its due diligence and informed the investing public.

345.    The materially false and misleading statements by TD Securities, and the other acts by TD Securities which operated as a fraud or deceit upon Plaintiff, as alleged herein, were made in connection with the offering and sale of the Bonds.

346.    By virtue of an agreement between Plaintiffs and CGTC, CGTC made the investment decisions on behalf of Plaintiffs. As a result, reliance by CGTC constitutes reliance by Plaintiffs.

347.    Plaintiffs and CGTC relied on the materially false and misleading statements in purchasing the Bonds. In particular, before purchasing Bonds on behalf of Plaintiffs, CGTC read and relied on the Offering Memorandum issued in connection with the marketing and sale of the

2009 Bonds and the financial statements contained in and made a part that document. CGTC also relied on the financial advisory and underwriting work of TD Securities.

348.    These materially false and misleading statements, and TD Securities' fraudulent and deceitful acts, proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages.

349.    At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC knew of any of the false and/or misleading statements and omissions.

350.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT V

### Violation of Section 18 of the Exchange Act
### Against Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys

351.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

352.    This claim is brought pursuant to Section 18 of the Exchange Act against Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys.

353.    As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC. Specifically, the Company's audited financial statements for fiscal 1997, fiscal 1998 and fiscal 1999 were included in the Company's Forms 10-K that were filed with the SEC. Those financial statements were

later withdrawn and restated by material amounts, which by way of definition (see Accounting Principles Board Opinion No. 20) makes them false and misleading.

354.    By virtue of an agreement between Plaintiffs and CGTC, CGTC made the investment decisions on behalf of Plaintiffs. As a result, reliance by CGTC constitutes reliance by Plaintiffs.

355.    CGTC read the false and misleading statements of the Company's financial condition in the 1998 10-K, and relied upon those statements when deciding to purchase Bonds on behalf of Plaintiffs, not knowing that they were false and misleading. This reliance was reasonable, particularly given the clean audit opinion from the Company's auditor, PwC.

356.    Each of Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys signed the Company's Forms 10-K for fiscal 1998.

357.    When the truth was finally revealed about the false and misleading statements in the Company's documents and reports filed with the SEC, including the existence of accounting irregularities, Plaintiffs were significantly damaged by the resulting drop in the value of the Company's Bonds.

358.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with its purchases of Bonds.

359.    By virtue of the foregoing, Defendants Bullock, Haworth, Tippie, Wareham, Winger, and Humphreys have violated Section 18 of the Exchange Act.

-121-

## COUNT VI

### Violation of Section 20(a) of The Exchange Act
### Against Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo

360.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

361.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo.

362.    Although the Company is not a party, nor are Plaintiffs asserting claims against the Company in this action, the Company committed primary violations of Sections 10(b) and 18 of the Exchange Act, and Rule 10b-5 promulgated by the SEC, by making false and misleading statements of material fact in connection with the purchase and sale of securities, including false and misleading statements in Forms 10-K and other documents filed with the SEC, which were relied upon by Plaintiffs to their detriment (as described herein).  At the time these false and misleading statements statements were made, the Company knew, or was reckless in not knowing, of their falsity.

363.    Defendants Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo controlled the Company within the meaning of Section 20(a) of the Exchange Act. Bullock was Chairman of the Board of the Company as well as Chief Executive Officer of the Company's largest stockholder, Laidlaw; Haworth was a director and Chairman of the Audit Committee of the Company, as well as Chief Financial Officer of Laidlaw; Tippie was a director of the Company, and took over for Haworth as Chairman of the Audit Committee in March 1999; Wareham was a director and member of the Audit Committee of the Company; Winger was a

-122-

director and Chief Executive Officer of the Company; Humphreys was Chief Financial Officer of the Company; and Bragagnolo was Chief Operating Officer of the Company.

364.    By virtue of their high level positions with the Company, their participation on the Audit Committee, and their participation in and/or awareness of the Company's finances and operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to investors (including Plaintiff), these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other statements which Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, financial statements and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected.

365.    In particular, Winger, Humphreys and Bragagnolo, as executive officers of the Company, had direct and supervisory involvement in and controlled the Company's day-to-day operations; Bullock was directly involved through his role as Chairman of the Board; and Haworth, Tippie and Wareham were intimately involved with and controlled the Company's accounting and its financial reporting through their service on the Audit Committee of the Board.

366.    By virtue of their positions as controlling persons, Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo are liable pursuant to Section 20(a) of the Exchange Act.

367.    Bullock, Haworth, Tippie, Wareham, Winger, Humphreys, and Bragagnolo each had knowledge of or reasonable ground to believe that the Company's financial statements contained untrue statements of material fact and/or omitted material facts required to be stated therein to make them not misleading, and each was at least reckless in allowing those financial statements to be published without being corrected.

368.    At the time Plaintiffs purchased the Bonds, neither Plaintiffs nor CGTC knew of any of the Company's false and/or misleading statements and omissions, and they relied on the Company's public financial statements and other statements regarding its financial condition, including the Company's 1998 Form 10-K filing, as alleged herein.

369.    As a direct and proximate result of the wrongful conduct of these Defendants and the Company, Plaintiffs suffered damages.

### COUNT VII

**Common Law Fraud**
**Against Bullock, Tippie, Wareham, Winger, Humphreys, PwC, and TD**

370.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

371.    This Count is brought pursuant to common law against Defendants Bullock, Tippie, Wareham, Winger, Humphreys, PwC, and TD Securities.

372.    As alleged herein, Defendants Bullock, Tippie, Wareham, Winger, and Humphreys made false representations of material facts by, among other things, approving and signing Forms 10-K, Forms 10-Q, Offering Memoranda, and Registration Statements which contained materially false financial statements and other materially false statements regarding the Company's financial

condition. Defendant PwC made misrepresentations of material facts by, among other things,
issuing unqualified opinions on the Company's financial statements, and falsely stating that
PwC's audits of those financial statements had complied with GAAS and that the financial
statements fairly presented the Company's financial position in accordance with GAAP.
Defendant TD Securities made misrepresentations of material facts regarding the Company's
financial condition by, among other things, participating in the preparation of the Offering
Memoranda.

373.    In making their material false representations regarding the Company's financial
condition, each of the Defendants either knew that those representations were false or acted with
reckless disregard for the truth or falsity of those representations.

374.    Each of the Defendants knew and intended that investors would act in reliance
upon the representations of the Company's financial condition as set forth in the Company's
financial statements, including those in its Forms 10-K, Forms 10-Q, Forms 8-K, press releases,
Offering Memoranda, and Registration Statements.

375.    By virtue of an agreement between Plaintiffs and CGTC, CGTC made the
investment decisions on behalf of Plaintiffs. As a result, reliance by CGTC constitutes reliance by
Plaintiffs.

376.    CGTC read the Defendants' false and misleading statements of the Company's
financial condition, and relied upon those statements, when deciding to purchase Bonds on behalf
of Plaintiffs, not knowing that they were false and misleading. CGTC also relied on those
statements when deciding to cause Plaintiffs to hold rather than sell the Bonds prior to March 6,

-125-

2000. Plaintiffs and CGTC had a right to rely, and reasonably relied, on the Defendants' false statements, particularly given the clean audit opinion from the Company's auditor, PwC.

377.    At the time Plaintiffs purchased the Bonds, and at all times prior to March 6, 2000, neither Plaintiffs nor CGTC knew of any of the Defendants' false representations.

378.    Plaintiffs suffered damages as a direct and proximate result of purchasing and holding Bonds in reliance upon Defendants' false representations.

## JURY DEMAND

379.    Plaintiffs demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.     Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.     Awarding punitive damages in favor of Plaintiff on Plaintiff's claims for common law fraud;

C.     Awarding Plaintiff prejudgment interest and/or opportunity cost damages;

D.     Awarding Plaintiff the fees and expenses incurred in this action, including allowance of fees for Plaintiff's attorneys and experts; and

E.     Granting such other and further relief as the Court may deem just and proper.

DATED: _____4/12/05_____     _____

Pope D. Johnson, III
Federal I.D. No. 2206
McCutchen, Blanton, Johnson & Barnette, L.L.P.
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for Plaintiff

Stuart M. Grant
Megan D. McIntyre
Grant & Eisenhofer P.A.
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE  19801
(302) 622-7000
Lead Counsel for Plaintiff